IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO:  1:18-CV-24931- DPG

KATIUSKA VELEZ, individually, and as parent
and guardian for BRANDON VELEZ,

    Plaintiffs,

v.

CORAL GATE WEST CONDOMINIUM
ASSOCIATION, INC.

    Defendants
_____/

## RESPONSE TO DEFENDANT'S MOTION TO DISMISS

COMES NOW, Plaintiff, KATIUSKA VELEZ, individually, and as parent and guardian for BRANDON VELEZ, by and through her undersigned counsel, and responds to the Motion to Dismiss [DE- 9] filed by Defendant, CORAL GATE WEST CONDOMINIUM ASSOCIATION, INC., and states as follows:

    **I.**    **Introduction and Facts**

Brandon Velez and his mother, Katiuska Velez lived in an apartment at Coral Gate West Condominium. Brandon Velez is currently a 23 year old man with an intellectual disability, autism, and a bi-polar disorder, and is under a full, plenary guardianship in which his mother is Brandon Velez' guardian.  DE 1, ¶3, 4.   When Ms. Velez and her son moved into Coral Gate West in 2014, Ms. Velez asked for an accommodation for a parking space for her mother to watch Brandon Velez while Ms. Velez was at work. DE 1, ¶ 9.

Throughout, the Velez' tenancy at Coral Gate West, the property manager would direct Katiuska Velez that Brandon was not allowed to be by the hallways or to stand by the elevators

because, according to the property manager, people thought that Brandon Velez looked weird and that he may scare people. DE 1, ¶ 16. Because of Brandon Velez' disability, the property manager did not like Brandon Velez unaccompanied in the building and wandering through the halls. Pursuant to Defendant's property manager's request, Katiuska Velez placed a padlock on their front door because a deadbolt could not be placed on the door. DE 1 ¶ 10.

From the one year leasehold from July 2015 to July 2016, Brandon Velez had three incidents because of his disability, one involved going into an open apartment of a resident as he thought it was a friend, the other involved when a water fountain that became detached from a wall, and the third incident involved a broken window in the laundry room which occurred in April 2016. DE 1, ¶ 12-14. Katiuska Velez was not given a notice to cure, notice of non-renewal, and her lease was renewed in July 2016 for another year. DE 1, ¶ 15.

On December 19, 2016 at 2:10 A.M., Brandon Velez locked himself in the public laundry room and masturbated in front of a washing machine and was filmed by the security camera. DE 1, ¶ 17. The very next day, the property manager advised Katiuska Velez that because of what Brandon did, they would need to leave the building. DE 1, ¶ 22-23. A few hours later, the owner of Ms. Velez' condominium unit was advised that the Velez family must leave within 30 days. DE 1, ¶ 24. The Formal Notice of termination of tenancy only mentioned the masturbation incident, and did not mention any of the prior incidents during the last leasehold:

> This is a formal notification that your tenant Katiuska Velez was in violation of the rules & regulations where she lives. Her son took apart a piece of one of the washing machines from building 7000 first floor and also practiced inappropriate behavior while in the laundry room. For this violation we are requesting that tenants vacate the property within 30 days from the date of this letter.

DE 1, ¶ 33.

As a person who is intellectually and developmentally disabled with severe functional limitations, Brandon Velez qualifies for a Medicaid Waiver (iBudget Waiver). See Fla. Stat. Chapter 393. Immediately after this episode, Ms. Velez went to Brandon's support coordinator[1] to ask for help with Brandon Velez and his needs. The support coordinator, Sujay Rodriguez, personally went to the property on two occasions to speak with the property manager and the employees of Defendant to explain that according to the Fair Housing Act, the Velez family could not get evicted for a disability-related reason. DE 1, ¶¶ 26-30. Then Ms. Rodriguez went asked the property manager for a reasonable accommodation due to Brandon's disabilities that they were working on Brandon getting his behavioral analyst therapy to correct this behavior. DE 1, ¶ 31. In response, the property manager told Ms. Rodriguez that what Brandon did had nothing to do with his disability and that she was scared he would rape or molest someone in the complex. Id.

Because the request was denied, on January 15, 2017, Katiuska Velez and her family were forced to move to a more expensive, but less suitable apartment, and thereafter because of the trauma of moving, and changes of environment, Brandon was placed in a group home. DE 1, ¶¶ 35-36.

## II.   Standard of Review

The Plaintiff's Complaint pleads sufficient facts and the law to withstand a motion to dismiss. A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) should be granted if the

---

[1] "'Support coordinator' means a person who is designated by the [Florida Agency for Persons with Disabilities] to assist individuals and families in identifying their capacities, needs, and resources, as well as finding and gaining access to necessary supports and services; coordinating the delivery of supports and services; advocating on behalf of the individual and family; maintaining relevant records; and monitoring and evaluating the delivery of supports and services to determine the extent to which they meet the needs and expectations identified by the individual, family, and others who participated in the development of the support plan." § 393.063(41), Fla Stat.

allegations in the complaint fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion tests the formal sufficiency of the allegations of claims for relief. The dismissal of a complaint is warranted "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Glover v. Liggett Group, Inc., 459 F.3d 1304, 1308 (11th Cir. 2006).

When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Those "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 570). In short, the complaint cannot merely allege misconduct, but must demonstrate that it is plausible that the pleader is entitled to relief. See Id. at 1950.

### III.     Plaintiff states a claim under 3604(f)(1) and (f)(3).

This case is, for all intents and purposes, identical to Hunt v. Aimco Props., L.P., 814 F.3d 1213 (11th Cir. 2016), in which a young man with an intellectual disability was non-renewed from his home with his mother because the property manager believed that the young man was threatening the property manager when he was really telling them about an Anime cartoon that he liked. Even when the mother suggested an accommodation, it was immediately refused. Based upon these facts, the Eleventh Circuit found that a claim was stated. In Hunt, the perceived threat was human sacrifice and mass immolation of the entire development. In this case, it was a young

man with an intellectual disability who locked himself in a laundry room in the morning hours so he could masturbate in private.

Plaintiffs first claim is a claim under 3604(f)(1) of the Fair Housing Act, which states as follows:

> (f) (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of--
>
> (A) that buyer or renter,[;]
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (C) any person associated with that buyer or renter.

42 USCS § 3604(f)(1). As with Hunt, there is no claim that they had actual knowledge that Brandon has a disability. Hunt, 814 F.3d at 1222. The Defendant's knew that he not only had a disability, but it was an intellectual disability and the Defendant had an animus against him as they constantly expressed concerns about how he appeared. See DE 1, ¶ 29 (According to the property manager, Maria, "Brandon could not be in the hallways or walking within the premises [because] people say that Brandon looks 'weird'.")

"In disparate treatment cases, the landlord allegedly is motivated by a discriminatory purpose and courts commonly evaluate the parties' respective positions by employing the familiar three-stage burden-shifting approach outlined in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) (interpreting Title VII of the Civil Rights Act of 1964)." Douglas v. Kriegsfeld Corp., 884 A.2d 1109, 1128-29 (D.C. 2005); Schwarz v. City of Treasure Island, 544 F.3d 1201, 1218-19 (11th Cir. 2008). To prove disparate treatment, the plaintiff must show the defendant in fact intended to discriminate or was improperly motivated in making the discriminating decision. Bonasera v. City of Norcross, 342 F. App'x 581, 584 (11th

Cir. 2009). However, the desire to discriminate need not be the sole motivating factor. *See* <u>Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 265, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977). Notwithstanding the explanation of Ms. Velez as well as Brandon's support coordinator, and their knowledge of Brandon's disability, Defendant decided to end their tenancy solely based on Brandon's disability. The extension of FHA protections to individuals with disabilities in the 1988 amendments was a recognition of the principle that a person's disability, no less than his or her race or sex, is an impermissible reason to deny equal access to housing opportunities. <u>Shapiro v. Cadman Towers, Inc</u>., 51 F.3d 328, 333 (2d Cir. 1995). The relevant legislative history (which the Second Circuit cited in Shapiro) indicates that the amendments represented

> a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream. It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.

H.R. Rep. No. 100-711, at 18 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2179. Among other things, the amended FHA was intended to prohibit "the application or enforcement of otherwise neutral rules and regulations on health, safety and land-use in a manner which discriminates against people with disabilities," which "often results from false or over-protective assumptions about the needs of handicapped people, as well as unfounded fears of difficulties about the problems that their tenancies may pose." <u>Laflamme v. New Horizons, Inc</u>., 605 F. Supp. 2d 378, 386-87 (D. Conn. 2009) quoting H.R. Rep. No. 100-711, at 24 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2179. (footnote omitted). "Intentional discrimination can include actions motivated by stereotypes, unfounded fears, misperceptions, and 'archaic attitudes', as well as simple prejudice

about people with disabilities." Oxford House-C v. City of St. Louis, 843 F. Supp. 1556, 1575-76 (E.D.Mo. 1994); see also School Board of Nassau County v. Arline, 480 U.S. 273, 279, 107 S. Ct. 1123, 1126, 94 L. Ed. 2d 307 (1987). The premise of the Defendant's motion to dismiss is other violations of rules prior to the current leasehold. To the extent that the order to leave was solely based upon other violations, despite questionable, would be an issue for the trier of fact, and not appropriate in a Rule 12(b)(6) motion for failure to state a claim.

There is no question that the reason for the non-renewal of tenancy, was that based on the aforesaid "generalized perceptions about disabilities and unfounded speculations about threats to safety", Brandon was deemed a direct threat with no basis and rejected from tenancy.

As to the reasonable accommodation claims (Count II), "to assert a failure to reasonably accommodate claim under section 3604(f)(3), a plaintiff must plead four elements: (1) the plaintiff is a person with a disability within the meaning of the FHA or a person associated with that individual; (2) the plaintiff requested a reasonable accommodation for the disability; (3) the requested accommodation was necessary to afford the plaintiff an opportunity to use and enjoy the dwelling; and (4) the defendant refused to make the accommodation." Hunt v. Aimco Props., L.P., 814 F.3d 1213, 1225 (11th Cir. 2016). Unlike Hunt, where magic words to invoke the right to an accommodation were not needed, in this matter, the magic words were stated, and there was no question that an accommodation request was being made. DE 1, ¶ 31. The response was a denial, and further reiteration of the stereotypical basis - "In response, the property manager told Sujay that what Brandon did had nothing to do with his disability and that she was scared he would rape or molest someone in the complex." DE 1, ¶ 31.

This matter is completely distinguishable from Groner v. Golden Gate Gardens Apts., 250 F.3d 1039 (6th Cir. 2001). In Groner, the loud disturbances were an ongoing issue with many

noise-related complaints in which the landlord had tried numerous accommodations. The accommodations included soundproofing the doors, and allowing for the plaintiff to develop a plan to reduce the noisemaking. Id at 1042-1043. In this case, the accommodation was denied from a one-time issue. The accommodation requested was behavioral modification therapy. DE 1, ¶ 31. The property manager refused and said that "what Brandon did had nothing to do with his disability and that she was scared he would rape or molest someone in the complex." The fact that the Defendant states (and expects) that it is not egregiously discriminatory to have a condition of tenancy that having a padlock on Ms. Velez door so Brandon would not be left alone in the common areas of the property demonstrates the degree of discriminatory animus held by the defendant. See DE 9, p. 7.

    **IV.**     **Masturbation in private is not a direct threat.**

The basis of the Defendant's direct threat defense is that Brandon posed a threat because he could harm others because he was found masturbating in an area which Brandon felt was private. Primarily, direct threat is an affirmative defense, but notwithstanding where it may be asserted, it strains the bounds of credulity.

Masturbation is not a direct threat to the health and safety of anyone, and there is no objective evidence that a young man with an intellectual and developmental disability will harm anyone else because he masturbates. Although the FHA provides an exception for landlords for providing a reasonable accommodation to a tenant who "constitute[s] a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damages to the property of others", 42 U.S.C. § 3604(f)(9), invocation of the 'direct threat' exemption requires 'objective evidence that is sufficiently recent as to be credible, and not from unsubstantiated inferences, that the applicant will pose a direct threat to the health and safety of others. . . . "' United

States v. Massachusetts Indus. Fin. Agency, 910 F.Supp. 21, 27 (D.Mass.1996) (quoting H.R.Rep. No. 711, 100th Cong., 2d Sess. (1988)) see also Bragdon v. Abbott, 524 U.S. 624, 649, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998) (noting that Congress incorporated identical excluding individuals who "would constitute a direct threat to the health and safety of other individuals" into the FHA, the Rehabilitation Act, and the Americans with Disabilities Act (ADA), and finding that, under the ADA, "[t]he existence or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodations, and the risk must be based on medical or other objective evidence"). The direct threat requires a direct inquiry to gather the necessary evidence to comply with the narrow exemption to deem an individual a threat, and a requirement for the landlord to determine whether the threat can be mitigated, with or without a request. Guidance from the Department of Housing and Urban Development specifically requires a direct inquiry prior to deeming a person a direct threat, and such issue is directly addressed in their guidance:

> **5. How can a housing provider determine if an individual poses a direct threat?**
> The Act does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general. A determination that an individual poses a direct threat must rely on an individualized assessment that is based on reliable objective evidence (*e.g*., current conduct, or a recent history of overt acts). The assessment must consider: (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat. Consequently, in evaluating a recent history of overt acts, a provider must take into account whether the individual has received intervening treatment or medication that has eliminated the direct threat (*i.e*., a significant risk of substantial harm). **In such a situation, the provider may request that the individual document how the circumstances have changed so that he no longer poses a direct threat. A provider may also obtain satisfactory assurances that the individual will not pose a direct threat during the tenancy. The housing provider must have reliable, objective evidence that a person with a disability poses a direct threat before excluding him from housing on that basis.**

>    **Example 2**: James X, a tenant at the Shady Oaks apartment complex, is arrested for threatening his neighbor while brandishing a baseball bat. The Shady Oaks' lease agreement contains a term prohibiting tenants from threatening violence against other residents. Shady Oaks' rental manager investigates the incident and learns that James X threatened the other resident with physical violence and had to be physically restrained by other neighbors to keep him from acting on his threat. Following Shady Oaks' standard practice of strictly enforcing its "no threats" policy, the Shady Oaks rental manager issues James X a 30-day notice to quit, which is the first step in the eviction process. James X's attorney contacts Shady Oaks' rental manager and explains that James X has a psychiatric disability that causes him to be physically violent when he stops taking his prescribed medication. Suggesting that his client will not pose a direct threat to others if proper safeguards are taken, the attorney requests that the rental manager grant James X an exception to the "no threats" policy as a reasonable accommodation based on James X's disability. The Shady Oaks rental manager need only grant the reasonable accommodation if James X's attorney can provide satisfactory assurance that James X will receive appropriate counseling and periodic medication monitoring so that he will no longer pose a direct threat during his tenancy. After consulting with James X, the attorney responds that James X is unwilling to receive counseling or submit to any type of periodic monitoring to ensure that he takes his prescribed medication. The rental manager may go forward with the eviction proceeding, since James X continues to pose a direct threat to the health or safety of other residents.

See Joint Statement of the Department of Housing and Urban Development (HUD) and the Department of Justice: Reasonable Accommodations under the Fair Housing Act, 2004. (hereinafter referred to as Joint Statement)[2] For example, in <u>Laflamme v. New Horizons, Inc</u>., 605 F. Supp. 2d 378 (D. Conn. 2009), where the landlord claimed that a tenant was discharged from

---

[2] <u>http://www.hud.gov/offices/fheo/library/huddojstatement.pdf</u>.  This is a policy statement, not an authoritative interpretation of § 3604. <u>Overlook Mut. Homes, Inc. v. Spencer</u>, 415 F. App'x 617, 621 n.3 (6th Cir. 2011)(citing <u>Christensen v. Harris Cnty</u>., 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000) ("[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law[,] do not warrant Chevron-style deference."). It may of course, have the "power to persuade." See <u>Christensen</u>. (citing Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944)). Further, in this district, Judge Scola has given deference to this interpretation by HUD, see <u>Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer</u>, 2014 U.S. Dist. LEXIS 32705, 22 (S.D. Fla. Mar. 13, 2014).

the housing opportunity due to the tenant's reported depression and suicidal ideation that made her dangerous to herself and her roommate, the court found that questions can be asked and need to be targeted:

> Thus, in assessing an application for tenancy, a landlord or owner may ask an individual the questions that he or she asks of all other applicants that relate directly to the tenancy (e.g., questions relating to rental history or a targeted inquiry as to whether the individual has engaged in acts that would pose a direct threat to the health or safety of other tenants), but may not ask blanket questions with regard to whether the individual has a disability. Nor may the landlord or owner ask the applicant or tenant questions which would require the applicant or tenant to waive his right to confidentiality concerning his medical condition or history.

Id. at 388 (citing H.R. Rep. No. 100-711, at 29-30. ).   In this matter, the Defendant had the opportunity to speak to the mother and the support coordinator to determine the imminence or issue of a threat, or how this was not atypical of a person with a developmental or intellectual disability to have inappropriate sexual behavior.

Even in more egregious behavior, such as assault on a neighbor, the analysis for direct threat is demanded.  For example, in  Sinisgallo v. Town of Islip Hous. Auth., 865 F. Supp. 2d 307, 336 (E.D.N.Y. 2012), the court found that the fact that a disabled individual with a bipolar condition committed a violent act (assaulting a neighbor) does not automatically warrant a finding that they constitute a "direct threat". Rather, the court cited to the HUD regulations which mandate:

> In determining whether an individual poses a direct threat to the health or safety of others, the agency must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk

24 C.F.R. § 9.131(c)(emphasis added).  Whether the facility is a public or private landlord, if the landlord determines if the person is a direct threat, it is the landlord or property owner's obligation

to demonstrate that there is **no** reasonable accommodation that will eliminate or minimize the risk the tenant poses to other residents. Sinisgallo, 865 F.Supp. 2d at 336 (citing Roe v. Sugar River Mills Assocs., MB, 820 F. Supp. 636, 640 (D.N.H. 1993). An absence of such effort will be a violation of the Fair Housing Act. Id. See also Bos. Hous. Auth. v. Bridgewaters, 452 Mass. 833, 842, 898 N.E.2d 848, 855-56 (2009)(finding that before a public housing authority may lawfully evict a disabled tenant who requests a reasonable accommodation as posing a threat to others, it must either demonstrate the failure of an accommodation instituted at the request of the tenant, or demonstrate that no reasonable accommodation will acceptably minimize the risk the tenant poses to other residents.); See Roe v. Housing Auth. of Boulder, 909 F. Supp. 814, 822-823 (D. Colo. 1995) ("assuming Roe is handicapped or disabled, before he may lawfully be evicted [the housing authority] must demonstrate that no 'reasonable accommodation' will eliminate or acceptably minimize any risk Roe poses to other residents"); Roe v. Sugar River Mills Assocs., 820 F. Supp. 636, 640 (D.N.H. 1993) ("assuming plaintiff is handicapped, the Act requires defendants to demonstrate that no 'reasonable accommodation' will eliminate or acceptably minimize the risk he poses to other residents before they may lawfully evict him"); Douglas v. Kriegsfeld Corp., 884 A.2d 1109, 1120 (D.C. 2005) (accord); Arnold Murray Constr. v. Hicks, 2001 SD 7, 621 N.W.2d 171, 175, 176 (S.D. 2001) (eviction affirmed where court held landlord had "established that no reasonable accommodation would curb the threat [the tenant] poses," and concluding that when "landlord shows that no reasonable accommodation will curtail the risk, its duty to accommodate ceases").

The issues in sexually acting out for a person with an intellectual or developmental disability is not an atypical issue, and there is **no** link between masturbation and a direct threat to others. See McLay, Laurie, et al,. A Systematic Review of Interventions for Inappropriate Sexual

Behavior of Children and Adolescents with Developmental Disabilities, Journal of Autism and Developmental Disorders, December 2015, Volume 2, Issue 4, pp 357–373. Children with Autism Spectrum Disorder are reported to frequently engage in public masturbation. See McLay, supra, p. 2. This is part and parcel of the disability, which for persons with autism is the difficulties with regards to social norms. See A.L. v. Walt Disney Parks & Resorts US, Inc., 900 F.3d 1270, 1280-81 (11th Cir. 2018). Further, there are many effective interventions to modify such behaviors. See Tonya N. Davis, et al., A Review and Treatment Selection Model for Individuals with Developmental Disabilities Who Engage in Inappropriate Sexual Behavior, Behav. Anal. Pract. 2016 Dec; 9(4): 389–402. The typical coginitive-behavioral interaction that is used for preventing inappropriate sexual behavior is as follows:

> (1) discussion with the participant in order to normalize intervention and encourage them to engage in sexual behavior in private, (2) teaching distraction and sensitization techniques for when he had a sexual urge, (3) encouraging the participant to carry putty to play with when anxious or bored (as replacement for masturbation), and (4) parent education in how to manage inappropriate masturbation.

McLay, p. 20. In fact, many of the behaviors that are not unusual for this population include uninvited or inappropriate sexual touching of another person, public self-stimulatory behavior, exhibitionist behavior, and inappropriate use of language. However, most of these behaviors are treated as any other inappropriate behavior that is demonstrated by a person with an intellectual or social disability.

The stereotype of a person with an intellectual or developmental disability as the abuser is also without any basis in law or fact. Persons with intellectual disabilities have the highest risk of violent victimization. See Leigh Ann Davis, People with Intellectual Disabilities and Sexual Violence, found at https://www.thearc.org/document.doc?id=3657. People with intellectual and

developmental disabilities are sexually assaulted at a rate seven times higher than those of people without a disability. NPR, The Sexual Assault Epidemic No One Talks About, https://www.npr.org/2018/01/08/570224090/the-sexual-assault-epidemic-no-one-talks-about

In the event that "direct threat" is a defense in this case, for the pleading stage it is not a cause for dismissal in a motion to dismiss. Further, based on the facts as alleged, if they are established, it is unlikely that the Defendant can substantiate this defense.

**WHEREFORE**, KATIUSKA VELEZ, individually, and as parent and guardian for BRANDON VELEZ, respectfully requests that this Court DENY CORAL GATE WEST CONDOMINIUM ASSOCIATION, INC.., motion to dismiss and grant as any other such relief as this Court deems just and equitable.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 28, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all parties and counsel of record in the herewith service list, or in some other authorized manner for those counsel or parties who are not authorized to receive notices electronically.

DISABILITY INDEPENDENCE GROUP, INC.
2990 Southwest 35th Avenue
Miami, Florida 33133
Tel: (305) 669-2822
Fax: (305) 442-4181
Email: Mdietz@justDIGit.org
aa@justdigit.org
lgoodman@justdigit.org

By: s/ *Matthew W. Dietz*
LISA C. GOODMAN, ESQ.
Florida Bar No.: 118698
MATTHEW W. DIETZ, ESQ.
Florida Bar No.: 0084905