IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO:  1:18-CV-24931- DPG

KATIUSKA VELEZ, individually, and as parent
and guardian for BRANDON VELEZ,

  Plaintiffs,

v.

CORAL GATE WEST CONDOMINIUM
ASSOCIATION, INC.

  Defendants

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, KATIUSKA VELEZ, individually, and as a parent and guardian for BRANDON VELEZ, by and through the undersigned, hereby files her responses to Defendants, CORAL GATE WEST CONDOMINIUM ASSOCIATION, INC., Motion for Summary Judgment, and states as follows:

### I. Introduction

The Defendant's Motion for Summary Judgment demands judgment on Plaintiff's fair housing claims solely on the affirmative defense that Brandon Velez, an Autistic young man with an intellectual disability, was a direct threat because he masturbated in a community laundry room at 2:30 in the morning.  Solely as a result of a disability-related behavior, Mr. Velez, and his mother, Katiuska Velez, were ordered to leave their home.

While common sense would dictate that such behavior would not rise to the level of a direct threat, the affirmative defense should not even be available to the Defendant as there was no threat or accommodation assessment ever done at the time of the decision to deny a dwelling to Ms.

Velez and her son.  The defendant's affirmative defense and this motion is based on the very same stereotypes that the Fair Housing Act was designed to abolish.  Without any knowledge of intellectual or developmental disabilities, or even retaining an expert in the subject, the defendants continue to propagate myths and stereotypes of a disabled young man as too dangerous to be part of our community.

### II.  Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P., Rule 56; <u>Beal v. Paramount Pictures Corp.,</u> 20 F.3d 454, 458 (11th Cir.1994). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986). Further, the evidence must be construed in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,</u> 475 U.S. 574, 587 (1986). The nonmoving party must also provide more than a mere "scintilla" of evidence to avoid summary judgment. <u>Id.</u> at 252. It is the moving party's burden to establish that there is no genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23(1986). The inquiry which this Court must conduct is whether the evidence presents a "sufficient disagreement" to require submission to a jury and if finding no issue in dispute, whether the moving party is entitled to a judgment as a matter of law. <u>Anderson</u>, 477 U.S. at 251-52. Defendant is not entitled to summary judgment as there are genuine issues of material fact.

As an affirmative defense, the burden of proof is on the housing provider that asserts direct safety threat as a defense to a disability discrimination action. Dadian v. Vill. of Wilmette, 269 F.3d 831, 840 (7th Cir. 2001); Echazabal v. Chevron USA, Inc., 336 F.3d 1023, 1027 (9th Cir. 2003).

### III.    Facts and background

As demonstrated by the Plaintiff's Response to Defendant's Statement of Facts (hereinafter "PSOF"), the Plaintiff disputes many of the Defendant's statement of facts, and inferences drawn from their statement of facts, with specific citations to the record. Accordingly, the Plaintiff presents her facts, and describes Mr. Velez's disability with the support of a declaration and report from a Board Certified Behavioral Analyst[1] with over 33 years of experience, with knowledge of Mr. Velez and a statement of facts in this case

Mr. Velez is currently a 24 year old man who lives with an intellectual disability and Autism.  PSOF ¶1, 32.  From July 15, 2014 to January 2017, Mr. Velez lived at Coral Gate West with his mother, Katiuska Velez.

 When he was in high school, Mr. Velez would receive services from the school system, and would receive services from his father's health plan. PSOF ¶ 6.  In order to obtain home-based services for Brandon Velez' disability, his mother must apply for a home and community-based services waivers authorized by 42 U.S.C. 1396n(c) (HCBS Waivers or Med[icaid] Waiver) to obtain long-term care services and supports in their home or community, rather than in an

---

[1] A Board Certified Behavioral Analyst is a professional that is trained  to develop interventions for persons with developmental or intellectual disabilities to teach or increase occurrence of skills to replace behavior targeted for change and arrange delivery of consequences for desirable and undesirable behavior. Fla. Admin. Code § 65G-4.001

institutional setting.  These services include, but are not limited to behavioral intervention services, therapies, and residential habitation options.

Katiuska Velez knew her son needed such supports, and applied to have such supports when he was 14 years old and was put on the wait list to obtain the benefits. PSOF ¶ 6.  The Wait list is currently more than 25,000 persons, and Mr. Velez was high on the priority list (Priority Category 3) Id.  See § 393.065(5), Fla. Stat.   In 2013, Brandon Velez still was not eligible for the Med-waiver, Katiuska Velez lost her home, and as Mr. Velez was getting to be an adult who is stronger, Ms. Velez needed additional care.  Because of the additional care required, Ms. Velez requested a crisis waiver, and met the standards to receive services under Rule 65G-1.047, Fla. Admin. Code.  Because of Ms. Velez' efforts, she was able to get the additional community based care that Brandon Velez needed.  This included behavior supports to adjust to his daily activities.  By the time he moved into Coral Gate West, Ms. Velez had a support coordinator and the supports she needed in place.

Katiuska Velez and her son, Brandon, moved into Coral Gate West in 2014.  Ms. Velez had a caretaker for the first few months of her tenancy, and therafter, had her mother care for Mr. Velez while Ms. Velez worked nights as a hospice care nurse. PSOF ¶ 8,9.  However, Mr. Velez would wander the hallways, and Ms. Velez did not view it as a problem because he could not get outside onto the street.  PSOF, ¶12.  The Defendants did not like the fact that he would wander the hallways, and demanded that his mother place a lock on his door so he would not leave the apartment.[2] PSOF ¶12, 13.  The Defendant deemed that this behavior was a nuisance, and that Mr.

---

[2] The Defendant claims that Mr. Velez would knock on doors and claim to have video and have complaints, however, there is not one person identified who complained, and no evidence (video or otherwise) established of any complaint. PSOF ¶11, 12.

Velez looked "weird". PSOF ¶11, 12.

From the beginning of the tenancy in July 15, 2014 to November 27, 2015, there were no violations of any association rules.  The first inciednt occurred in November 27, 2015, when Mr. Velez was playing with his cousin and broke the water fountain off of the wall in the common area.  PSOF ¶15.  Ms. Velez paid for the damage.  The second incident occurred in February 2016, when Mr. Velez walked into an open apartment at night, and ran away when he was discovered. There was no violation issued for that incident.  PSOF ¶16, 17.  A third incident occurred when Mr. Velez broke a small window in April 2016, when he was upset at his father. Ms. Velez paid for that. PSOF ¶ 18.  **For eight month**s following the broken window, there were no incidents whatsoever.

On December 19, 2016, Brandon Velez was caught on video masturbating in the laundry room at 2:33 in the morning. PSOF ¶ 19.   The property manager, Maria Guinart, met Ms. Velez outside her apartment when she arrived home from the night shift, and advised her that Mr. Velez "was caught on camera masturbating numerous times.", and urged her to come to the management office to watch the video.  PSOF ¶ 21. Ms. Velez refused to watch the video of her son. Id.   At that very moment, the property manager stated that Ms. Velez and her son were going to have to leave Coral Gate West, and that the board was going to insist that she leave.  Id.  Ms. Velez started crying and stated that it had to do with his disability.  Ms. Guinart replied that it had nothing to do with his disability, and that he was "*sinverguenzeria*", meaning, in Spanish, that Brandon Velez was shameless scoundrel or rogue.

On December 20th, the video was emailed to the Board members, and the board reached the conclusion that Brandon Velez was just too dangerous to live in the association.  PSOF ¶ 20. The president of the association, Carlos Zubero, Ms. Guinart's husband, believed the masturbation

incident was a very serious incident because it "is a serious sexual act, and in any other circumstances, it would have been a felony and he would have been arrested. Any this is – this happened in the common area where children and parents usually walk by with their children." PSOF ¶20. This incident occurred at 2:33 in the morning. Id. When the notice of violation was issued the same day demanding that the Velez family vacate the unit, it only mentioned the "lewd sexual behavior while in the laundry room" and not any other incident at Coral Gate West. PSOF ¶ 20.[3]

Ms. Velez' APD Waiver support coordinator,[4] Sujay Rodriguez, came to speak to the property manager to plead for the Velez family and explain Brandon Velez disability and his needs. PSOF, ¶ 22. Ms. Rodriguez requested an accommodation that it reconsider its decision to terminate the lease and advised the association of Mr Velez' ongoing therapy related to his behavior. Id. According to Ms. Rodriguez, "That [Mr. Velez] was going to get behavior analyst services and [will be] working on correcting that behavior." Id. Ms. Guinart did not request any information, and maintained that the Velez family would need to move out, and stated "Okay, the board, or we, don't know what a person with those characteristics …can happen with him or what can he do." PSOF ¶ 22.

---

[3] In the motion and statement of facts, Defendant alleges that any other person would have been evicted. However, the facts demonstrate that at this same time, the association did not evict the adult son of a tenant that would vandalize the property, physically threaten employees and the postal worker, and would climb up the side of the building on other tenant's balconies on the way to his apartment. PSOF ¶ 17. In addition, the defendant failed to evict the family of a tenant's son who broke into cars and stole cellular telephones. Id.

[4] For more information, see APD Support Coordination Frequently Asked Questions, found at http://apd.myflorida.com/waiver/support-coordination/frequently-asked-questions.htm; see also, page 2-67 to 2-91, in the DD waiver handbook, found at http://apd.myflorida.com/ibudget/docs/DD_iBudget_Rule%2059G-13.070Adoption.pdf

The Velez family moved out of Coral Gate West and into a different apartment. The new apartment had a lake in the rear, and Ms. Velez was constantly worried for the safety of her son. PSOF ¶ 5, 24. It was not like Coral Gate West, where Brandon Velez could walk around the facility and not be in danger. Id. Ms. Velez was concerned for her son's safety with the water and dogs. PSOF ¶ 24. Furthermore, Brandon Velez did not talk for a week after the move and his behaviors worsened. Id.

Brandon Velez could not acclimate to his new home, and his mother was concerned for his safety, as she moved him into Jesus Group home with several other men with intellectual and developmental disabilities. PSOF ¶ 24. Unlike living under the same roof as a parent, and being the center of attention, life is different at a group home. As such, there is resistance to doing tasks that he does not want to do. As stated by Dr. Appleton:

> Jesus group home reports similar types of behaviors as he did before his move. There are demand that are similar to peers in his community. Brandon is expected to follow routines at the group home. Because of these demand, activities of daily living (ADL's) getting up in the morning, and others, Brandon will display maladaptive behaviors typically to try to avoid these activities.

PSOF ¶ 28. As such, when he became more acclimated to the environment and being with other adults of similar needs, the behaviors decreased. Id.

In reviewing current applicable knowledge of behavioral analysis, according to the Declaration of Dr. Appleton, the behaviors of Brandon Velez did not pose a threat or danger to others. PSOF ¶ 37. Brandon Velez is a very shy man, and is more scared of others than a danger to anybody. PSOF ¶ 36. This is demonstrated by both the event when he ran away when he was discovered in the neighbor's home, and his refusal to address the masturbation incident. PSOF ¶ 33, 34. Mr. Velez does not like confrontation and will run away. Id. As to the masturbation issue, Mr. Velez received stimulation from the machine, and he did it because it felt good to him. PSOF

¶ 33. It was not a threat to anyone, and in the threat assessment done, it was not deemed to be predatory behavior at all. PSOF ¶ 33. It was merely another behavior to address and develop interventions to prevent.

### IV.     The Defendant Cannot Establish the Affirmative Defense of Direct Threat

The Fair Housing Act provides an exception to denying tenancy to a person with a disability, when "an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9). The regulations for direct threat, promulgated by the Department of Housing and Urban Development, provide as follows:

> (b) "Direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.

> (c) In determining whether an individual poses a direct threat to the health or safety of others, the agency must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

24 C.F.R. § 9.131. The direct threat exception was enacted to address concerns that passage of the Fair Housing Amendment Act would prevent landlords from evicting tenants with disabilities who posed a threat to others, so Congress decided that a tenant with a disability would not qualify for protection if "he or she would pose a threat to the safety of others, unless such threat can be eliminated by reasonable accommodation." House Report at 28. In the HUD/DOJ Joint Guidance, it poses and answers the question of what is a direct threat:

### How can a housing provider determine if an individual poses a direct threat?

The Act does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general. A

determination that an individual poses a direct threat must rely on an individualized assessment that is based on reliable objective evidence (*e.g.*, current conduct, or a recent history of overt acts). The assessment must consider: (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat. Consequently, in evaluating a recent history of overt acts, a provider must take into account whether the individual has received intervening treatment or medication that has eliminated the direct threat (*i.e.*, a significant risk of substantial harm). In such a situation, the provider may request that the individual document how the circumstances have changed so that he no longer poses a direct threat. A provider may also obtain satisfactory assurances that the individual will not pose a direct threat during the tenancy. The housing provider must have reliable, objective evidence that a person with a disability poses a direct threat before excluding him from housing on that basis.

**Example 2**: James X, a tenant at the Shady Oaks apartment complex, is arrested for threatening his neighbor while brandishing a baseball bat. The Shady Oaks' lease agreement contains a term prohibiting tenants from threatening violence against other residents. Shady Oaks' rental manager investigates the incident and learns that James X threatened the other resident with physical violence and had to be physically restrained by other neighbors to keep him from acting on his threat. Following Shady Oaks' standard practice of strictly enforcing its "no threats" policy, the Shady Oaks rental manager issues James X a 30-day notice to quit, which is the first step in the eviction process. James X's attorney contacts Shady Oaks' rental manager and explains that James X has a psychiatric disability that causes him to be physically violent when he stops taking his prescribed medication. Suggesting that his client will not pose a direct threat to others if proper safeguards are taken, the attorney requests that the rental manager grant James X an exception to the "no threats" policy as a reasonable periodic medication monitoring so that he will no longer pose a direct threat during his tenancy. After consulting with James X, the attorney responds that James X is unwilling to receive counseling or submit to any type of periodic monitoring to ensure that he takes his prescribed medication. The rental manager may go forward with the eviction proceeding, since James X continues to pose a direct threat to the health or safety of other residents.

Department of Justice and HUD, Joint Statement on Reasonable Accommodations at 4-5 (May 17, 2004), available at:

https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/joint_statement_ra.pdf    (last visited November 9, 2019) ("Joint Statement"). "Though the Joint Statement is a policy statement, rather than an authoritative interpretation of FHA and therefore does not warrant Chevron-style

deference it is nonetheless entitled to respect to the extent it has the power to persuade." Bhogaita v. Altamonte Heights Condo. Ass'n, Inc., 765 F.3d 1277, 1286, n. 3 (11th Cir. 2014) (internal quotations omitted).

The reasoning behind this requirement of substantiating a "direct threat" is to deter property owners from recklessly evicting residents with developmental, intellectual, or psychological disabilities based upon a perceived direct threat without any determination of actual or imminent harm. "To protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear, the Supreme Court has required an individualized direct threat inquiry that relies on the best current medical or other objective evidence." Lowe v. Ala. Power Co., 244 F.3d 1305, 1308 (11th Cir. 2001) (quoting Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1248 (9th Cir. 1999)). In most cases where the direct threat exemption is raised, it is based on the belief or stereotype that a person with a disability cannot do a certain job or that a person's condition poses a threat. The direct threat analysis is identical for the Rehabilitation Act, the Fair Housing Act and the Americans with Disabilities Act. Bragdon v. Abbott, 524 U.S. 624, 649, 118 S. Ct. 2196, 2210 (1998). It also must be noted that the failure to make this analysis deprives persons with intellectual and developmental disabilities to live in least restrictive environment in communities with their families, instead of in institutions. See Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 581 (1999). In this case, Brandon Velez was separated from his mother and placed in a facility that is not his family home.

### A. When does the analysis of direct threat need to be made?

As with any discrimination case, the intent of the defendant **at the time** when the allegedly discriminatory decision is made is the determinative factor in determining whether a discriminatory act took place. Primarily, a housing provider bears the burden of proof on the

direct threat defense at trial.  Dadian v. Vill. of Wilmette, 269 F.3d 831, 840-41 (7th Cir. 2001).

When a decision is made to exclude a person based on a direct threat, the housing provider must

prove that that it made a "reasonable judgment" to evict the tenant  after "mak[ing] an

individualized assessment ... that relie[d] ... on the best available objective evidence to ascertain:

the nature, duration, and severity of the risk" the person created; "the probability that the potential

injury will actually occur; and whether reasonable modifications of policies, practices, or

procedures will mitigate the risk."  Friedel v. Park Place Cmty. LLC, 747 Fed. Appx. 775, 777

(11th Cir. 2018)(quoting 24 C.F.R. § 9.131(c).

 In Friedel, the Eleventh Circuit excluded *all* evidence that was not considered at the time

the housing provider made its allegedly discriminatory housing decision.  Id.  See also, Fowler v.

Borough of Westville, 97 F.Supp.2d 602, 609 (D.N.J. 2000)(finding that evidence of a tenant's

drug use four months after the filing of the lawsuit could not serve as a basis for the landlord's

eviction of the tenant. "[T]he benchmark date is the date of the alleged discrimination or

harassment which underlies the lawsuit, not the date on which a dispositive motion is filed.")

 In this case, at the time the discriminatory decision was made, on December 19 and 20,

2016, there was **no** analysis made by the Defendant.  They had actual knowledge that Mr. Brandon

Velez had autism and an intellectual disability and were concerned, as Mr. Zubero said,  "This is

a serious sexual act, and in any other circumstances, it would have been a felony and he would

have been arrested.  And this is – this happened in the common areas where children and parents

usually walk by with their children."  Or as Ms. Guinart said, immediately after the incident, when

saying that the Velez family would leave - "No, it has nothing to do with his disability, that is

*sinverguenzeria*"

The Defendant did not attempt to obtain the "best available objective evidence to ascertain: the nature, duration, and severity of the risk" the person created; "the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk."

Because there was no attempt to do an analysis at the time of the discriminatory decision, the direct threat defense is unavailable to the Defendant as a matter of law, and the Defendant's summary judgment must be denied.

### B.  What analysis is required to establish a direct threat?

The rigorous analysis to determine a direct threat under the Fair Housing Act is identical to the rigorous analysis under the Americans with Disabilities Act.  In Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 122 S. Ct. 2045 (2002), the U.S. Supreme Court decided that, prior to determining whether a person with a disability is a direct threat to his own safety or the safety of others in employment, the employer must conduct a rigorous enquiry:

> [The EEOC's] regulation disallows just this sort of sham protection, through demands for a particularized enquiry into the harms the employee would probably face. The direct threat defense must be "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence," and upon an expressly "individualized assessment of the individual's present ability to safely perform the essential functions of the job," reached after considering, among other things, the imminence of the risk and the severity of the harm portended.

Id. at 85-86, 122 S. Ct. at 2052-53 (quoting 29 C.F.R. § 1630.2(r) (2001)))  The analysis is the same for the Fair Housing Act.  See Corey v. Sec'y, U.S. HUD, 719 F.3d 322, 328 (4th Cir. 2013) (finding landlord's stereotypes about direct threat regarding people with autism were not supported by any objective evidence, as is required to trigger the exception.)

Furthermore, even if a direct threat is identified, the housing provider then has the burden of demonstrating that ***no*** reasonable accommodation will eliminate or acceptably minimize the risk that Brandon Velez poses to other residents before the association could lawfully make tenancy unavailable to him. Sinisgallo v. Town of Islip Hous. Auth., 865 F. Supp. 2d 307, 336 (E.D.N.Y. 2012) (finding that the mere fact that a disabled individual committed a violent act does not automatically warrant a finding that they constitute a "direct threat", instead all of the factors of the direct threat defense must be analyzed). "Indeed, depending on the circumstances, the mere absence of such an effort [to offer an accommodation] may be violative of the FHAA." Sinisgallo, 865 F. Supp. 2d at 336 *see* Roe v. Hous. Auth., 909 F. Supp. 814, 823-24 (D. Colo. 1995) (holding that "before [the plaintiff] may lawfully be evicted [the housing authority] must demonstrate that no 'reasonable accommodation' will eliminate or acceptably minimize any risk [the plaintiff] poses to other residents . . ."); Roe v. Sugar River Mills Assocs., 820 F. Supp. 636, 640 (D.N.H. 1993) (finding that the "defendants [must] demonstrate that no 'reasonable accommodation' will eliminate or acceptably minimize the risk [the plaintiff] poses to other residents . . . before they may lawfully evict him.); Arnold Murray Const., L.L.C. v. Hicks, 2001 SD 7, 621 N.W.2d 171, 175 (S.D.) ("If a handicapped tenant is a direct threat to the health and safety of other tenants, the landlord is obligated to either reasonably accommodate the tenant's handicap or show that no reasonable accommodation will eliminate or acceptably minimize the risk posed by the handicapped tenant…When the landlord shows that no reasonable accommodation will curtail the risk, its duty to accommodate ceases.")

The Defendant claims that Mr. Velez is a "direct threat" because his mother attested that he needed to be a threat to himself or others --- but notably left out the required talisman necessary to get APD Medicaid services under Rule 65G-1.047, Fla. Admin. Code – "without required

supports in order to live in the community". **The Defendant has not identified any specific**

**threat that Brandon Velez may pose**. He has not exhibited violence to any person at the housing

facility.  The Defendant fails in all prongs of the direct threat analysis:

> The assessment must consider: (1) the nature, duration, and severity of the risk of
> injury; (2) the probability that injury will actually occur; and (3) whether there are
> any reasonable accommodations that will eliminate the direct threat.

### (1) Nature, duration, and severity of the risk of injury.

In the motion, it was not clear as to the aspect of Mr. Velez' tenancy which the DEfedntn

claimed that posed a risk.  The only issue that was common throughout the tenancy was that the

condominium board president believed that Mr. Velez walking around the halls was a nuisance,

and his wife, the property manager, believed Mr. Velez looked "weird".

If the association is claiming that the destruction of property, the destruction of property

was minor occurred on two occasions in a period of six months of a two year tenancy, and Ms.

Velez paid for the damages, and there was no notice to cure, and the notice of termination did not

include any of these events.

If it was the one occasion in which Mr. Velez went into an unlocked door of another unit

owner's apartment, this occurred on one occasion, he never received a violation, and it had not

occurred again.  Mr. Velez was so scared of any confrontation, he ran away.

Lastly, the masturbation issue occurred on one occasion, and there was no injury to

property or to any third party, as it occurred at 2:33 in the morning. The announcement of losing

tenancy was made by the same day by the property manager, and the notice of termination occurred

the next day by the board of directors.

Compared to the example in the Joint Guidance above, Mr. Velez' behavior was of

negligible severity and no risk of injury.

**(2) the probability that injury will actually occur:**

The probability of any risk of injury in the future is speculative and negligible, and there was no injury in the past.

**(3) whether there are any reasonable accommodations that will eliminate the direct threat**

Mr. Velez' Support coordinator requested that they be allowed to attempt behavioral applied therapy to prevent this from happening again.

## V.    The Plaintiff requested a Reasonable Accommodations that was not even considered.

In any event, the behaviors posed by Brandon Velez would not be a direct threat to the safety of others.  However, even if the behaviors were deemed to be a direct threat, the defendant refused to even consider any reasonable accommodation. In this matter, Mr. Brandon Velez's waiver support coordinator requested an accommodation that it reconsider its decision to terminate the lease and advised the association of Mr Velez' ongoing therapy related to his behavior.  PSOF ¶ 22.  This was rejected out of hand without any consideration.

The basis of the rejection is mere speculation that any additional therapy would not have made a difference in any event.  See DE 28, p. 10-11.  This post hoc reasoning is not admissible or relevant for purposes of determining direct threat or for speculating on the future effect of an accommodation.  See, supra,  Friedel v. Park Place Cmty. LLC, 747 Fed. Appx. 775, 777 (11th Cir. 2018) and Fowler v. Borough of Westville, 97 F.Supp.2d 602, 609 (D.N.J. 2000).  There are many, many assumptions apparent in this proposition:

1.   The behavioral treatment for all Mr. Velez' treatment is identical.  Unlike shock therapy (which is now cruel and unusual), behavioral interventions are tailored to the maladaptive behaviors. The assumption that the same therapy as before would have

been used for different behaviors is without basis or merit, and not demonstrated in the documents presented.

2. What "dangerous and disruptive" behaviors are being targeted?  The Defendant appear to be concerned about some future inchoate harm. The defendant does not state – is the defendant theorizing on "violent outbursts and confrontations" which never occurred at Coral Gate West, or other unspecified behaviors

3. Whether the behaviors at the group home are very different from those at his family home.  It is speculation to say that Mr. Velez would have eloped from his home like he would do at a group home, and it is not unlawful to elope from one's home. Furthermore, the increase of the behaviors were due to the transfer to a group home with other responsibilities.  See Dr. Appleton's opinion, PSOF ¶ 28, and for the past two years, there is a trend of declining behavioral issues. Id.

The adverse behaviors that Brandon Velez had in his tenancy beginning in July of 2014, until the laundry room incident in December 2017, were *extremely* infrequent and did not establish a pattern of any issues.   Rather than being indicative of the efficacy of the accommodations, the increase of behaviors from living at his home with his mother to living in a group home are manifestations of the damages that Brandon Velez suffered.   In a period of one year, a young man with an intellectual disability and autism whose behaviors are acclimated to routines was (1) moved to two different homes; (2) separated from his mother and grandmother and placed in an environment with other men; (3) required to comply with new sets of routines and behaviors.  While this would be challenging for a neurotypical person, it is monumental for an Autistic person.  See, PSOF, ¶ 28.

Furthermore, the Plaintiff is not required to "point to" any specific reasonable accommodation.  In <u>United States v. Hialeah Hous. Auth</u>., 418 Fed. Appx. 872, 877 (11th Cir. 2011), once a housing provider has enough information to know of both Mr. Velez's disability and his need for an accommodation, the housing provider must open a dialog or request information to determine if an accommodation can be provided.  <u>Id</u>.  If, for any reason, the association was skeptical of Mr. Velez disability or the efficacy of an accommodation, "it is incumbent upon [the housing provider] to request documentation or open a dialogue."  <u>Id</u>.

As with the failure to assess whether the threat was real and direct, the association failed to assess whether Mr. Velez required a reasonable accommodation to ameliorate any perceived threat.  They believed that it had nothing to do with his disability, and he was merely a "Sinverguenza" or a shameless scoundrel.

WHEREFORE Plaintiff, KATIUSKA VELEZ, individually, and as a parent and guardian for BRANDON VELEZ, respectfully requests that this court DENY Defendants, CORAL GATE WEST CONDOMINIUM ASSOCIATION, INC., Motion for Summary Judgment, and strikes their affirmative defense of direct threat, and grant such further relief as this court deems just and equitable.

Respectfully Submitted on this 11th day of November, 2019.

By:    /s/ Matthew W. Dietz
        Matthew W. Dietz, Esq.
        Florida Bar No.: 0084905

*Velez v. Coral Gate West Condominium*
*Case No.: 18-CV-24931- DPG*
*Page 18 of 18*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 11, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all parties and counsel of record, or in some other authorized manner for those counsel or parties who are not authorized to receive notices electronically.

DISABILITY INDEPENDENCE GROUP, INC.
2990 Southwest 35th Avenue
Miami, Florida 33133
Telephone: (305) 669-2822
Facsimile: (305) 442-4181
Mail:    mdietz@justdigit.org
         aa@justdigit.org

By:     /s/ Matthew W. Dietz
        Matthew W. Dietz, Esq.
        Florida Bar No.: 0084905

        *Attorney for Plaintiff*