```
1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
2                        MIAMI DIVISION
                   CASE NO. 18-CV-24931-DPG
3

4   KATIUSKA VELEZ,                    Miami, Florida

5        Plaintiff,                    February 12, 2020

6           vs.                        10:00 a.m. to 10:40 a.m.

7   CORAL GATE WEST                    Pages 1 to 28
    CONDOMINIUM ASSOCIATION, INC.
8
         Defendant.
9   _____


10
                   TELEPHONIC STATUS CONFERENCE
11           BEFORE THE HONORABLE DARRIN P. GAYLES
                   UNITED STATES DISTRICT JUDGE
12
    APPEARANCES:
13

14  FOR THE PLAINTIFF:       MATTHEW W. DIETZ, ESQ.
                             MATTHEW W. DIETZ
15                           2990 SW 35th Avenue
                             Miami, Florida 33133
16
    FOR THE DEFENDANT:       KATHLEEN M. MERWIN, ESQ.
17                           COLE SCOTT & KISSANE
                             222 Lakeview Avenue, Suite 120
18                           West Palm Beach, Florida 33401

19

    STENOGRAPHICALLY REPORTED BY:
20
                             PATRICIA DIAZ, FCRR, RPR, FPR
21                           Official Court Reporter
                             United States District Court
22                           400 North Miami Avenue
                             11th Floor
23                           Miami, Florida 33128
                             (305) 523-5178
24

25
```

1              (Call to the Order of the Court.)

2         COURTROOM DEPUTY:  Calling Velez versus Coral Gate West

3    Condominium Association, Inc., case number 18-CV-24931.

4         Counsel, please make your appearance.

5         MR. DIETZ:  Good morning, Your Honor, Matthew Dietz,

6    Disability Independence Groups on behalf of Katiuska Velez,

7    individually and as parent for her son, Brandon Velez.

8              MS. MERWIN:  Good morning, Your Honor, Katie Merwin on

9    behalf of Coral Gate West Condominium Association, Inc.

10             THE COURT:  Okay.  Good morning.  We are set for a

11   status conference today.  Also, there are motions for summary

12   judgment pending from the defendant and as we indicated, I

13   would hear some brief argument about that.  I'm sorry, give me

14   just a moment.

15        I guess first starting with this issue regarding the

16   subsequent incidents and -- as well as the prior incidents, the

17   incidents prior to Mr. Velez and his mother moving into the

18   apartment building.

19        Ms. Merwin, why should I consider that at all in this

20   case?

21        MS. MERWIN:  For two reasons, Your Honor, the first is

22   to show that the plaintiff has testified and they are actually

23   relying on testimony that she objectively didn't believe that

24   her son's disability created a threat or that the very issue

25   that resulted in his eviction, wandering the hallways at night,

1    entering other people's homes, property damage, as well as a

2    list of many other activities that she believes created a

3    direct threat and we have also cited case law that she put this

4    in an application for social security disability benefits

5    saying that because he is wandering the halls at night and

6    entering other people's home, he is a direct threat to himself

7    and others.  This is the very activity that he engaged in at

8    the association that she is now couching as innocuous and she

9    does not believe created a threat.

10        And what the case law says and we cited specifically in

11   Talavera V The School Board, an Eleventh Circuit case, which

12   says you are estopped from taking a position contrary to what

13   you have put on Social Security Disability benefits.

14        The specific language says that, "An ADA patient is

15   estopped from denying the truth of any statements made in her

16   disability application."

17        THE COURT:  Counsel, you have to slow down for the

18   court reporter, please.

19        MS. MERWIN:  I apologize, Your Honor.

20        So, again, that is the Talavera V School Board.  That's

21   an Eleventh Circuit case, 129 F.3d 1214.

22        So these prior incidents and this was actually while he

23   was residing at the association.  He was living with his father

24   in 2013, and when she actually made this application and that's

25   why it's relevant.  One, to demonstrate that this is an ongoing

1    issue he has had despite continuous treatment for most of his

2    life and that there is no reasonable accommodations that could

3    have ameliorated the effect of his disability or otherwise

4    prevented him from engaging in this behavior which his mother

5    believed was a direct threat to not only his own safety but the

6    safety of others.

7            THE COURT:  But don't I have to, me or a jury, decide

8    whether or not the association's judgment was reasonable at the

9    time it made the decision?

10           MS. MERWIN:  What the Eleventh Circuit says is that

11   what we have to show at the summary judgment stage is that we

12   made an objective analysis based on an individual assessment.

13   Once we make that showing, which we have through not only the

14   documentary evidence but the testimony of the Board's corporate

15   representative is wholly undisputed that after the most recent

16   incident, which was the masturbating incident in the community

17   laundry room, the Board took into consideration all the prior

18   incidents that made the determinations the behavior was

19   escalating.

20           Prior to this, he had broken into another unit --

21   another resident's unit and so we use these objective incidents

22   to make our determination that he was a threat to the health,

23   safety of others and himself, obviously, and --

24           THE COURT:  Counsel, Counsel, but my question is --

25           MS. MERWIN:  And after --

1           THE COURT:  Counsel, my question is, that decision --

2  that review has to be based on the association's decision at

3  that time.  Right?

4           MS. MERWIN:  It just has to be that it was objective

5  and individualized.

6           THE COURT:  So why would any subsequent behavior be

7  relevant to that analysis?

8           MS. MERWIN:  Because once we establish that threshold

9  element, the burden then shifts to the plaintiff to establish

10  that, one, he was not a direct threat or, two, that a

11  reasonable accommodation could ameliorate the effects of his

12  disability.  And the subsequent evidence, what they are

13  claiming here, they requested essentially a second chance

14  accommodations and -- so if given the opportunity to engage in

15  additional therapy, regardless of the fact that it was the same

16  therapy he had been receiving throughout his tenancy at the

17  association.  So there is no -- the treatment evidence is being

18  used at least for purposes of the summary judgment in this

19  amount is to show that there is no reasonable accommodation

20  that would have prevented future incidents.

21           What the treatment evidence shows is not only the

22  motivation for his actions.  It says he does have an affinity

23  for washing machines, eloping but that is something to be

24  expected with his disability and since being in a group home

25  confined for 24 hours -- I'm sorry, supervised for 24 hours a

1   day, not allowed to go out in public without supervision, he

2   was able to escape that group home, actually broke into another

3   residence and engaged in the same sexual maladaptive behavior

4   with her washing machine.

5         So this shows that there was no reasonable

6   accommodation that could have prevented the effect of his

7   disability from continuing while at the association.  That's

8   its relevance for the purposes of a summary judgment.  As it

9   relates to the trial, it goes to a litany of other issues

10  including the plaintiff's purported damages, the lynchpin in

11  their case, as far as damages is that his -- I'm sorry, his

12  behavior escalated because he had to move or otherwise his

13  condition deteriorated.

14        What the treatment evidence shows is that, in fact,

15  after the move he was diagnosed with schizophrenia and his

16  psychiatrist testified that that diagnosis would be expected to

17  accompany some of these additional behaviors or this decline.

18        You know, the plaintiffs plan on using treatment

19  evidence in the future to establish their damages and, you

20  know, it's -- they can't cherry-pick what treatment evidence

21  they are going to rely on because ultimately all of the experts

22  they designated, their current treating physicians, have to

23  rely on these medical records to make their opinion.

24        THE COURT:  So there is this other behavior prior to

25  the incident in the laundry room, the wandering the hallways,

1    the entering of resident's apartment, things of that nature.

2          Are you relying on those incidents prior to the laundry

3    room incident to establish a direct threat or are you -- or

4    just that, the laundry room incident?

5          MS. MERWIN:  It is all of the incidents taken together.

6    Obviously, the laundry room incident, as well as the breaking

7    in the association deemed to be the most severe.  What their

8    concern was is that it was a pattern of escalating behavior and

9    we had worked continuously with Ms. Velez throughout her

10   tenancy, but, you know, there was property damage.  There was

11   issues with him wandering the hallways at night, knocking on

12   doors and then, again, it's escalating to where he actually

13   entered another resident's unit at 5:00 in the morning.  You

14   know, when confronted he left.

15         Then shortly after that he broke a window, you know, he

16   punched a window during an altercation with his father, broke

17   the window, again, that's property damage, and shortly after

18   that the laundry room incident where he was in the laundry room

19   incident for 45 minutes exposing his genitals and masturbating,

20   again, not only putting himself in harm's way but putting other

21   people in harm's way and causing damage to the property.

22         I mean, the analysis is not just limited to the health

23   and safety of other residents.  It's also the property.  In

24   each one of these incidents, you know, the association the

25   board testified that they have considered and that it believes

1    that it's escalating and that now we can no longer safely have

2    him reside in the association and that our prior efforts to --

3            THE COURT:  Finish your thought, please.

4            MS. MERWIN:  Sorry, and that he posed a direct threat,

5    and, again, it was based on his individual statement which is

6    based on the objective evidence available to the association.

7    And, of course, the most -- the triggering event for this

8    analysis was, obviously, the laundry room incident.

9            THE COURT:  So one of the things that the plaintiff

10   points out in their response, the incident in the laundry room

11   happened in the wee hours of the morning and the door was

12   closed.  First, I guess to suggest that no one really was going

13   to encounter Mr. Velez in that situation, one, factually is

14   that accurate and, two, is there any significance to the fact

15   that the time and manner in which the incident took place?

16           MS. MERWIN:  No, Your Honor.  Of course, the door was

17   shut but there is no lock.  There is not even a door handle on

18   the door itself.  This is something that took place.  It did

19   occur at 2:30 in the morning and lasted, approximately,

20   45 minutes.  This is a type of community where, you know, for

21   example, Ms. Velez, she works nights.  There is a lot of

22   activity in the association.  Anyone -- the laundry room is

23   open and accessible to residents in the middle of the night,

24   and, you know, it has been used in the middle of the night.

25   Regardless, the fact that somebody didn't walk in this time

1  doesn't take away from the fact that engaging in that sexual

2  maladaptive behavior in a public setting in the middle of a

3  public laundry room poses a direct risk.  This time it was at

4  2:30 in the morning.  What's to suggest it wouldn't happen even

5  in a more highly trafficked time period in the future.

6          I mean, it's demonstrative of a situation, where,

7  unfortunately, given his disability is not and this is

8  consistent with what all of his treating physicians and

9  behavior analysts have said, is, you know, he does not

10  understand the social norms or the repercussions of his

11  actions.  In other words, there is nothing to suggest that he

12  went at 2:30 in the morning because he was trying, you know, to

13  be inconspicuous.  Again, I think that the fact that this one

14  time was at 2:30 in the morning really does not do anything to

15  ameliorate the risk by holding onto a hope that somebody

16  doesn't walk in in the future in the middle of the night.

17          Even if subsequent actions were to happen in the middle

18  of the night, it's not something the association legally could,

19  I think, justify to its residents in the event something did

20  happen.  We are on notice of this dangerous behavior and it was

21  escalating.  You know, looking at it from a resident's

22  perspective, he had just broken into somebody's unit and then

23  had escalated to breaking a window and then publicly

24  masturbating.

25          THE COURT:  One thing I wasn't clear, was someone in

1    the apartment when he went in or did the person arrive later

2    and discovered him in the apartment?

3         MS. MERWIN:  The resident was in the apartment when he

4    entered.  She screamed.  He eventually ran away, but she was

5    absolutely in the unit when he entered and saw him just -- what

6    she reported was he was dressed in all black, entered and

7    walked into her unit.  Granted, it was unlocked but, obviously,

8    he did not have permission to be in the unit.

9         THE COURT:  And at times you refer to the laundry room

10   incident as -- or maybe it's more than just a laundry incident.

11   You referred to his criminal behavior and I think one time you

12   referred to as a felony.  What is the crime, specifically, as

13   you understand it to be?

14        MS. MERWIN:  Sure.  That was testimony of the

15   president.  He believed it to be a crime commiserate with a

16   felony, and the crime that he believed was lewd and lascivious,

17   or something of that nature, you know, exposing sexual organs

18   publicly.  I don't know that -- I couldn't tell you whether or

19   not that would give rise to a felony, but I would point to case

20   law that says, you know, for purposes of a second-chance

21   accommodation which he is requesting, we don't have -- the fact

22   is that it is a crime in and of itself means that we don't have

23   to accommodate.

24        The case that I relied on was a one-time resident was

25   found to use drugs, which may not have been a felony.  It was,

1    I think, use of cocaine but the Court said, you know, we have a

2    zero tolerance policy and using that, breaking the law was

3    sufficient for the tenant to kick them out under the

4    circumstances, even though it was related to a disability.

5         THE COURT:  The incidents prior to the plaintiffs

6    moving into the building, was the defendant aware of those

7    incidents before they moved in?

8         MS. MERWIN:  No, Your Honor, and we are not offering

9    that evidence to establish that we took that into consideration

10   under our objective analysis.  It's just to impeach Ms. Velez

11   and also to demonstrate that, you know, despite treatment, this

12   has been an ongoing thing that cannot be ameliorated and that

13   goes directly to the plaintiff's burden to show that a

14   reasonable accommodation would have prevented incidents like

15   this in the future.

16        THE COURT:  So those prior incidents were learned in

17   discovery?

18        MS. MERWIN:  Correct, Your Honor.

19        THE COURT:  All right.  So Mr. Dietz --

20        MS. MERWIN:  Well, just to clarify, if you are

21   referring to the 2013 application for the social security

22   waiver, for the social security benefits, or I'm sorry, the

23   disability benefits, specifically as it relates to -- you know,

24   we were aware he was wandering the halls at night not to

25   reference that application but the other incidents with the

```
 1    family dog and the physical abuse of the mother and the

 2    grandmother, that is not something we were aware of until

 3    discovery but the other incidents that happened at the

 4    association, we were aware of.

 5          THE COURT:  And the incident with his father, that was

 6    previous to them moving in.  Correct?

 7          MS. MERWIN:  No, Your Honor.

 8          THE COURT:  No.

 9          MS. MERWIN:  No, he had an altercation with his father,

10    I believe it was over the telephone, but that was, I think, a

11    couple of months right before the laundry room incident.  We

12    were aware of that.

13          THE COURT:  I'm sorry, I think there was another

14    incident with his father.  I will find it.

15          Let me hear from Mr. Dietz.

16          So considering I have to look to whether or not the

17    plaintiff posed a direct threat and, of course, the issue

18    regarding the reasonable accommodations, but looking at it from

19    an objective standpoint, why should I not find that the laundry

20    room incident was the last of an escalation of incidents and

21    that their conclusion was reasonable?

22          MR. DIETZ:  Well, there are several reasons.  The

23    escalation of incidents are very separate incidents, and even

24    though Ms. Merwin was saying immediately thereafter, shortly

25    thereafter, shortly thereafter.  They weren't.  There was a
```

1   period of eight months between the date of the window incident

2   where Brandon broke a small window and his mother paid for it

3   and the incident involving the laundry room, and then two

4   months prior to that was the incident.

5        Two months prior to the window, which was approximately

6   ten months prior to the laundry room incident was when he went

7   into another apartment which the door was open.  There was no

8   police interaction.  There wasn't even a violation.  So this is

9   a -- and the important aspect is the question is, what is the

10  direct threat?

11       Is the fact that a young man with a developmental

12  disability was masturbating in the laundry room a direct

13  threat?  Who is it a direct threat to?

14       Are they saying that the general issue with Mr. Velez

15  being a person with a developmental disability that, as the

16  association has said over and over again, looks weird and

17  shouldn't be walking the halls or that the property manager

18  called shameless in Spanish is really a direct threat.  They

19  haven't even identified what the threat is but even in the

20  argument, they are saying, well, what happens if he masturbates

21  in the future in the laundry room.  Well, he has masturbated in

22  the laundry room over two years before that so it's really

23  difficult to say there is a direct threat when they haven't

24  even identified what the direct threat is.

25       THE COURT:  Apart from the laundry room, the incident

```
 1    when he went into the apartment is a pretty significant event,

 2    albeit, they didn't seek eviction because of that.  I mean, one

 3    can imagine a number of ways either Mr. Velez would have been a

 4    threat or a perceived threat to the resident or he, himself,

 5    could have been harmed.  She thought he was an intruder.  Why

 6    would that not be an incident, an objectively viewed threat?

 7         MR. DIETZ:  Well, in view of all the facts and

 8    circumstances, there wasn't a violation issued.  There wasn't a

 9    police report issued.  It was all known that he was a person

10    with a developmental disability and he ran away.  It was a one

11    time occurrence.  So to that extent, in the view of all the

12    facts and circumstances in the case, it wasn't even something

13    that the condominium deemed to be worthwhile to address at the

14    time of the violation.  So it wasn't even perceived at the time

15    to be a threat and if it was, they would have issued a

16    seven-day notice to cure.  Nothing was done.

17         To the extent that they are now trying to front load it

18    all and deem this person to be an incorrect threat just doesn't

19    make sense.  It's an issue for the jury.

20         Also, with regards to the final straw, the issue with

21    the masturbation in the laundry room, that was the only reason

22    cited in the denial of the lease -- I mean, in the eviction, in

23    the requirement to leave.  That was the only reason given to my

24    client.  It wasn't because of all the things that happened

25    before.
```

1          In addition to that and in response to the summary

2    judgment, I have listed three different situations with other

3    tenants that posed substantial risks, as in actual threat to

4    guards and other residence in the premises, and nothing

5    happened to them.  It just is an issue which, again, was never

6    used as a basis for anything until this case.

7          THE COURT:  All right.  Mr. Dietz, what is the

8    reasonable accommodation that they could provide?

9          MR. DIETZ:  The reasonable accommodation is to go to an

10   individual therapist.

11         What usually happens when they are dealing with an

12   adult or child with a developmental disability is you have to

13   address the behavior and do physical therapy.  Unlike the

14   defendant who had no expert in this case to address whether or

15   not it was a threat or what is the applicable therapy for this,

16   it's normal behavioral therapy, and also, behavioral therapy is

17   incident by incident.

18         You address an issue and you instruct what is the

19   proper and improper thing to do because of it, and this was

20   specifically requested by the support coordinator after this

21   incident and it was absolutely ignored.

22         THE COURT:  But was that -- was that articulated to the

23   defendant that -- that reasonable accommodation, the individual

24   therapy, was that articulated to the defendant, and if so, when

25   in this process and by whom?

1          I think you kind of answered the question in part.

2          MR. DIETZ:  Yes, let me direct you to where it is in my

3   motion, I mean, in my response cited.  That would be a request

4   for accommodation.  It is on page eight of my faxed response

5   number 22.  It was requested by Sujay Rodriguez, Mr. Velez's

6   APD waiver support coordinator.

7          THE COURT:  Okay.  So --

8          MR. DIETZ:  And in that part -- it was her quote, this

9   was done immediately -- it was done after the incident and

10  after Ms. Velez was told that she has to leave by the property

11  manager.  This is the same type of accommodation that was

12  requested in a similar type of accommodation that was requested

13  in Hunt versus Aimco.

14         THE COURT:  All right.  Anything finally, Ms. Merwin?

15         MS. MERWIN:  Yes, Your Honor, just briefly, to follow

16  up on your most recent question to Mr. Dietz, Sujay Rodriguez

17  testified, and we have addressed it in our reply to his

18  response to our fax, that one, she was not aware of all of

19  these prior incidents.  She just learned of them at the time of

20  the meeting and that she was not aware of any accommodation

21  that could have prevented, and that there had been no therapy

22  plan in place at that moment and she testified that she had

23  been receiving behavioral therapy but, obviously, you know,

24  there was no suggestion to the association that this could

25  prevent future incidents.

1        It was, he is disabled, he is receiving therapy, please

2    don't -- you know, please reconsider, but it was never anything

3    saying this would stop this from happening in the future if you

4    accommodate him.

5        MR. DIETZ:  Your Honor, if I may --

6        THE COURT:  Well, I don't need to hear any more

7    argument, thank you.

8        I have considered everything.  The motion for summary

9    judgment will be denied, as I find that there are genuine

10   issues of material fact as to whether the defendant's actions

11   posed a direct threat.  As regulations that implement the

12   statute indicate, direct threat means a significant risk to the

13   health and safety of others.  It cannot be eliminated by a

14   modification of policies, practices or procedures or by the

15   provision of auxiliary aids or services.

16       It also notes that in assessing whether after an

17   individual poses a direct threat, I have to consider whether

18   the agency made an individualized assessment based upon

19   reasonable judgment.  I think this is a very fact-intensive

20   decision that is best left to the jury whether or not the

21   defendant's actions constitute a direct threat, meaning a

22   significant risk of harm versus a mere nuisance.

23       Prior to the laundry incident, including when he walked

24   into the occupied apartment, the association took no action to

25   remove them from the building.  So, arguably, one could say or

1    believe that it really didn't pose -- those prior incidents

2    didn't really pose a direct threat as the association didn't

3    seek to remove Mr. Velez from the apartment.  And regarding the

4    laundry room incident, while obviously disturbing, under the

5    circumstances, the question of the time and manner of the

6    incident, I think that is a factual question that should be

7    left to a jury.

8          So I am respectfully going to deny the motion for

9    summary judgment.

10         I am going to grant the motion in limine.  The

11   assessment at issue, whether or not the defendant poses a

12   direct threat, it's the incident -- it's based on the facts

13   known to the association at the time.  So unless any of the

14   previous incidents prior to them moving into the building were

15   known to the defendant and the defendant considered that in its

16   decision, they are irrelevant.  So are the subsequent incidents

17   that happened, so I will grant that motion.

18         We are otherwise scheduled for trial.  I know that at

19   least one of the attorneys was not available for the March date

20   that was set.  There was a conflict.

21         I'm sorry, I'm sorry.  The defense counsel has a

22   conflict with next week and March 5 through 9.  When,

23   reasonably, do the parties think that you are available for

24   trial?

25         MS. MERWIN:  For the defense March is -- I'm sorry, I

1    am just looking at the calendar right now.  We have a conflict

2    March --

3         THE COURT:  Before you answer, let me just see when my

4    next available date is.

5         Starting with you, Mr. Dietz, how many days do you

6    think it's going to take to try this?

7         MR. DIETZ:  I think it's going to take from three to

8    four days, at maximum.

9         THE COURT:  For your case or in total?

10        MR. DIETZ:  In total.

11        THE COURT:  You agree with that, Ms. Merwin?

12        MS. MERWIN:  I would say most likely four days, but,

13   yes.

14        THE COURT:  We will set aside five days then.  While my

15   clerks are looking, Ms. Merwin, you know, I issued this notice

16   of court practices in my cases telling you that the pleadings

17   should be double spaced using 12-point type.  You didn't comply

18   with that on your motion.  It is very difficult to read.  I am

19   over 50.

20        MS. MERWIN:  I apologize.  It will not happen again, I

21   apologize.

22        Your Honor, may I just request slight clarification

23   regarding the motion in limine?

24        THE COURT:  Yes.

25        MS. MERWIN:  It's my understanding, obviously, that,

1    your ruling is based on that it's not relevant as to the

2    association's individualized objective assessment.

3         Would the evidence -- but I am talking mostly about the

4    treatment evidence that was acquired subsequently, is it also

5    your determination that it's not relevant as to the plaintiff's

6    claimed damages or whether a reasonable accommodation would

7    have prevented the -- would have actually prevented future

8    incidents?

9         THE COURT:  Well, I don't think it's relevant to the

10   reasonable accommodation issue either because, I mean, it

11   depends on the circumstances.  I mean, he was at a different

12   posture at that point later.

13        I mean, I understand what ultimately happened but what

14   might have amounted to reasonable accommodation at the time the

15   decision was made, I don't think is necessarily -- that it has

16   any bearing on what subsequently happened.

17        As to the issue of damages, why is that relevant?

18        MS. MERWIN:  The whole in the plaintiff's complaint,

19   the plaintiff alleges that his mental health deteriorated due

20   to the decision to evict.

21        What his physician has testified to is that he actually

22   was diagnosed with schizophrenia and that these behaviors were

23   consistent or are consistent with his also prior designation of

24   their disability.  So, in other words, it wasn't an escalation

25   caused by the eviction but a reasonable progression of his

1  continued disability.  And, you know, the plaintiff -- each of

2  the three experts identified by the plaintiffs are to testify

3  what his current condition is, and by removing the treatment

4  evidence, it's essentially allowing the plaintiff to

5  cherry-pick what, you know, testimony they want to offer

6  without allowing us to properly cross or impeach them based on

7  what their own opinions are with regard to the direct threat.

8          I mean, for example, Dr. Appleton is being offered to

9  testify that he wasn't a direct threat.  Well, Dr. Appleton

10  didn't treat him during this time.  He treated him after he

11  joined the group home.  So his opinion that he was not a direct

12  threat which the plaintiff is trying to use to establish his

13  case-in-chief necessarily relies on his very own documents

14  which say he is, in fact, a threat and there is a safety plan

15  in place and of that nature.

16          THE COURT:  All right.  Mr. Dietz, as to the damages

17  issue?

18          MR. DIETZ:  Yes, this is apples and oranges, Your

19  Honor.  After he -- and I don't agree with the factual analysis

20  done by Ms. Merwin.  As to damages, the question is how did the

21  loss of housing affect Brandon as how did the loss of housing

22  affect Mrs. Velez, how does it affect Brandon.  The fact that

23  his condition deteriorated is relevant as to the effect.

24          There is no question that they could cross-examine all

25  doctors on whether or not it deteriorated and whether or not it

1    deteriorated has no effect whatsoever on the intent of the

2    decision by the housing authority.

3            To the extent that there is any law involved in how we

4    could limit our damages, then that should be placed in a motion

5    in limine, but this has nothing to do whatsoever with the

6    intent of the housing provider to get Brandon out.

7            THE COURT:  Let me take another look at the pleadings

8    on that issue and I will render a ruling.

9            We have another case pending so I am going to have to

10   move on.

11           I am available for trial on May 11th if you will check

12   your calendars.

13           MR. DIETZ:  I should be fine.

14           I do have another trial with Judge Hinkle in the

15   Northern District that starts on May 4th and he is usually

16   pretty prompt when it comes to doing his trial calendar.

17           THE COURT:  Okay.

18           MR. DIETZ:  But if it's a two-week period, that goes

19   from May 4th to May 15th.

20           THE COURT:  All right.  Counsel, are you available

21   then?

22           MS. MERWIN:  I do have an arbitration scheduled for the

23   12th through the 13th.  I imagine I could change that.

24           THE COURT:  Okay.  So the two-week period includes

25   May 18th, so why don't we plan on trying it during the second

```
 1    week, May 18th.

 2            MS. MERWIN:  Okay.  Perfect.

 3            THE COURT:  It will be an early calendar call April

 4    22nd at 9:30 a.m.

 5            All right.  Thank you very much.

 6            MR. DIETZ:  Thank you, Your Honor.

 7            MS. MERWIN:  Thank you, Your Honor.

 8            (Proceedings were concluded at 10:40 a.m.)

 9

10                    C E R T I F I C A T E

11

12

13            I hereby certify that the foregoing is an

14    accurate transcription of the proceedings in the

15    above-entitled matter.

16

17    March 3, 2020          /s/Patricia Diaz
      DATE                   PATRICIA DIAZ, FCRR, RPR, FPR
18                           Official Court Reporter
                             United States District Court
19                           400 North Miami Avenue, 11th Floor
                             Miami, Florida 33128
20                           (305) 523-5178

21

22

23

24

25
```

## /

**/s/Patricia** [1] - 23:17

## 1

**10:40** [1] - 23:8
**11th** [2] - 22:11, 23:19
**12-point** [1] - 19:17
**1214** [1] - 3:21
**129** [1] - 3:21
**12th** [1] - 22:23
**13th** [1] - 22:23
**15th** [1] - 22:19
**18th** [2] - 22:25, 23:1

## 2

**2013** [2] - 3:24, 11:21
**2020** [1] - 23:17
**22** [1] - 16:5
**22nd** [1] - 23:4
**24** [2] - 5:25
**2:30** [4] - 8:19, 9:4, 9:12, 9:14

## 3

**3** [1] - 23:17
**305** [1] - 23:20
**33128** [1] - 23:19

## 4

**400** [1] - 23:19
**45** [2] - 7:19, 8:20
**4th** [2] - 22:15, 22:19

## 5

**5** [1] - 18:22
**50** [1] - 19:19
**523-5178** [1] - 23:20
**5:00** [1] - 7:13

## 9

**9** [1] - 18:22
**9:30** [1] - 23:4

## A

**a.m** [2] - 23:4, 23:8

**able** [1] - 6:2
**above-entitled** [1] - 23:14
**absolutely** [2] - 10:5, 15:21
**abuse** [1] - 12:1
**accessible** [1] - 8:23
**accommodate** [2] - 10:23, 17:4
**accommodation** [15] - 5:11, 5:19, 6:6, 10:21, 11:14, 15:8, 15:9, 15:23, 16:4, 16:11, 16:12, 16:20, 20:6, 20:10, 20:14
**accommodations** [3] - 4:2, 5:14, 12:18
**accompany** [1] - 6:17
**accurate** [2] - 8:14, 23:13
**acquired** [1] - 20:4
**action** [1] - 17:24
**actions** [5] - 5:22, 9:11, 9:17, 17:10, 17:21
**activities** [1] - 3:2
**activity** [2] - 3:7, 8:22
**actual** [1] - 15:3
**ADA** [1] - 3:14
**addition** [1] - 15:1
**additional** [2] - 5:15, 6:17
**address** [4] - 14:13, 15:13, 15:14, 15:18
**addressed** [1] - 16:17
**adult** [1] - 15:12
**affect** [3] - 21:21, 21:22
**affinity** [1] - 5:22
**agency** [1] - 17:18
**agree** [2] - 19:11, 21:19
**aids** [1] - 17:15
**Aimco** [1] - 16:13
**albeit** [1] - 14:2
**alleges** [1] - 20:19
**allowed** [1] - 6:1
**allowing** [2] - 21:4, 21:6
**altercation** [2] - 7:16, 12:9
**ameliorate** [2] - 5:11, 9:15
**ameliorated** [2] - 4:3, 11:12
**amount** [1] - 5:19
**amounted** [1] - 20:14
**analysis** [6] - 4:12,

5:7, 7:22, 8:8, 11:10, 21:19
**analysts** [1] - 9:9
**answer** [1] - 19:3
**answered** [1] - 16:1
**apart** [1] - 13:25
**apartment** [8] - 7:1, 10:1, 10:2, 10:3, 13:7, 14:1, 17:24, 18:3
**APD** [1] - 16:6
**apologize** [3] - 3:19, 19:20, 19:21
**apples** [1] - 21:18
**Appleton** [2] - 21:8, 21:9
**applicable** [1] - 15:15
**application** [5] - 3:4, 3:16, 3:24, 11:21, 11:25
**April** [1] - 23:3
**arbitration** [1] - 22:22
**arguably** [1] - 17:25
**argument** [2] - 13:20, 17:7
**arrive** [1] - 10:1
**articulated** [2] - 15:22, 15:24
**aside** [1] - 19:14
**aspect** [1] - 13:9
**assessing** [1] - 17:16
**assessment** [4] - 4:12, 17:18, 18:11, 20:2
**association** [16] - 3:8, 3:23, 5:17, 6:7, 7:7, 7:24, 8:2, 8:6, 8:22, 9:18, 12:4, 13:16, 16:24, 17:24, 18:2, 18:13
**association's** [3] - 4:8, 5:2, 20:2
**attorneys** [1] - 18:19
**authority** [1] - 22:2
**auxiliary** [1] - 17:15
**available** [6] - 8:6, 18:19, 18:23, 19:4, 22:11, 22:20
**Avenue** [1] - 23:19
**aware** [7] - 11:6, 11:24, 12:2, 12:4, 12:12, 16:18, 16:20

## B

**based** [8] - 4:12, 5:2, 8:5, 8:6, 17:18, 18:12,

20:1, 21:6
**basis** [1] - 15:6
**bearing** [1] - 20:16
**behavior** [12] - 4:4, 4:18, 5:6, 6:3, 6:12, 6:24, 7:8, 9:2, 9:9, 9:20, 10:11, 15:13
**behavioral** [3] - 15:16, 16:23
**behaviors** [2] - 6:17, 20:22
**believes** [2] - 3:2, 7:25
**benefits** [4] - 3:4, 3:13, 11:22, 11:23
**best** [1] - 17:20
**between** [1] - 13:1
**black** [1] - 10:6
**board** [1] - 7:25
**Board** [3] - 3:11, 3:20, 4:17
**Board's** [1] - 4:14
**Brandon** [4] - 13:2, 21:21, 21:22, 22:6
**breaking** [3] - 7:6, 9:23, 11:2
**briefly** [1] - 16:15
**broke** [4] - 6:2, 7:15, 7:16, 13:2
**broken** [2] - 4:20, 9:22
**building** [3] - 11:6, 17:25, 18:14
**burden** [2] - 5:9, 11:13

## C

**calendar** [3] - 19:1, 22:16, 23:3
**calendars** [1] - 22:12
**cannot** [2] - 11:12, 17:13
**case** [13] - 3:3, 3:10, 3:11, 3:21, 6:11, 10:19, 10:24, 14:12, 15:6, 15:14, 19:9, 21:13, 22:9
**case-in-chief** [1] - 21:13
**cases** [1] - 19:16
**caused** [1] - 20:25
**causing** [1] - 7:21
**certify** [1] - 23:12
**chance** [2] - 5:13, 10:20
**change** [1] - 22:23
**check** [1] - 22:11
**cherry** [1] - 6:20,

21:5
**cherry-pick** [2] - 6:20, 21:5
**chief** [1] - 21:13
**child** [1] - 15:12
**Circuit** [3] - 3:11, 3:21, 4:10
**circumstances** [5] - 11:4, 14:8, 14:12, 18:5, 20:11
**cited** [4] - 3:3, 3:10, 14:22, 16:3
**claimed** [1] - 20:6
**claiming** [1] - 5:13
**clarification** [1] - 19:22
**clarify** [1] - 11:20
**clear** [1] - 9:25
**clerks** [1] - 19:15
**client** [1] - 14:24
**closed** [1] - 8:12
**cocaine** [1] - 11:1
**commiserate** [1] - 10:15
**community** [2] - 4:16, 8:20
**complaint** [1] - 20:18
**comply** [1] - 19:17
**concern** [1] - 7:8
**concluded** [1] - 23:8
**conclusion** [1] - 12:21
**condition** [3] - 6:13, 21:3, 21:23
**condominium** [1] - 14:13
**confined** [1] - 5:25
**conflict** [3] - 18:20, 18:22, 19:1
**confronted** [1] - 7:14
**consider** [1] - 17:17
**consideration** [2] - 4:17, 11:9
**considered** [3] - 7:25, 17:8, 18:15
**considering** [1] - 12:16
**consistent** [3] - 9:8, 20:23
**constitute** [1] - 17:21
**continued** [1] - 21:1
**continuing** [1] - 6:7
**continuous** [1] - 4:1
**continuously** [1] - 7:9
**contrary** [1] - 3:12
**coordinator** [2] - 15:20, 16:6
**corporate** [1] - 4:14

**correct** [2] - 11:18, 12:6
**couching** [1] - 3:8
**Counsel** [1] - 4:24
**counsel** [5] - 3:17, 4:24, 5:1, 18:21, 22:20
**couple** [1] - 12:11
**course** [3] - 8:7, 8:16, 12:17
**Court** [3] - 11:1, 23:18, 23:18
**COURT** [34] - 3:17, 4:7, 4:24, 5:1, 5:6, 6:24, 8:3, 8:9, 9:25, 10:9, 11:5, 11:16, 11:19, 12:5, 12:8, 12:13, 13:25, 15:7, 15:22, 16:7, 16:14, 17:6, 19:3, 19:9, 19:11, 19:14, 19:24, 20:9, 21:16, 22:7, 22:17, 22:20, 22:24, 23:3
**court** [2] - 3:18, 19:16
**created** [2] - 3:2, 3:9
**crime** [4] - 10:12, 10:15, 10:16, 10:22
**criminal** [1] - 10:11
**cross** [2] - 21:6, 21:24
**cross-examine** [1] - 21:24
**cure** [1] - 14:16
**current** [2] - 6:22, 21:3

**D**

**damage** [4] - 3:1, 7:10, 7:17, 7:21
**damages** [8] - 6:10, 6:11, 6:19, 20:6, 20:17, 21:16, 21:20, 22:4
**dangerous** [1] - 9:20
**DATE** [1] - 23:17
**date** [3] - 13:1, 18:19, 19:4
**days** [4] - 19:5, 19:8, 19:12, 19:14
**dealing** [1] - 15:11
**decide** [1] - 4:7
**decision** [8] - 4:9, 5:1, 5:2, 17:20, 18:16, 20:15, 20:20, 22:2
**decline** [1] - 6:17
**deem** [1] - 14:18

**deemed** [2] - 7:7, 14:13
**defendant** [7] - 11:6, 15:14, 15:23, 15:24, 18:11, 18:15
**defendant's** [2] - 17:10, 17:21
**defense** [2] - 18:21, 18:25
**demonstrate** [2] - 3:25, 11:11
**demonstrative** [1] - 9:6
**denial** [1] - 14:22
**denied** [1] - 17:9
**deny** [1] - 18:8
**denying** [1] - 3:15
**designated** [1] - 6:22
**designation** [1] - 20:23
**despite** [2] - 4:1, 11:11
**deteriorated** [5] - 6:13, 20:19, 21:23, 21:25, 22:1
**determination** [2] - 4:22, 20:5
**determinations** [1] - 4:18
**developmental** [4] - 13:11, 13:15, 14:10, 15:12
**diagnosed** [2] - 6:15, 20:22
**diagnosis** [1] - 6:16
**Diaz** [1] - 23:17
**DIAZ** [1] - 23:17
**Dietz** [6] - 11:19, 12:15, 15:7, 16:16, 19:5, 21:16
**DIETZ** [12] - 12:22, 14:7, 15:9, 16:2, 16:8, 17:5, 19:7, 19:10, 21:18, 22:13, 22:18, 23:6
**different** [2] - 15:2, 20:11
**difficult** [2] - 13:23, 19:18
**direct** [24] - 3:3, 3:6, 4:5, 5:10, 7:3, 8:4, 9:3, 12:17, 13:10, 13:12, 13:13, 13:18, 13:23, 13:24, 16:2, 17:11, 17:12, 17:17, 17:21, 18:2, 18:12, 21:7, 21:9, 21:11
**directly** [1] - 11:13
**disability** [15] - 3:4, 3:16, 4:3, 5:12, 5:24,

6:7, 9:7, 11:4, 11:23, 13:12, 13:15, 14:10, 15:12, 20:24, 21:1
**Disability** [1] - 3:13
**disabled** [1] - 17:1
**discovered** [1] - 10:2
**discovery** [2] - 11:17, 12:3
**District** [2] - 22:15, 23:18
**disturbing** [1] - 18:4
**doctors** [1] - 21:25
**documentary** [1] - 4:14
**documents** [1] - 21:13
**dog** [1] - 12:1
**done** [4] - 14:16, 16:9, 21:20
**door** [5] - 8:11, 8:16, 8:17, 8:18, 13:7
**doors** [1] - 7:12
**double** [1] - 19:17
**down** [1] - 3:17
**Dr** [2] - 21:8, 21:9
**dressed** [1] - 10:6
**drugs** [1] - 10:25
**due** [1] - 20:19
**during** [3] - 7:16, 21:10, 22:25

**E**

**early** [1] - 23:3
**effect** [4] - 4:3, 6:6, 21:23, 22:1
**effects** [1] - 5:11
**efforts** [1] - 8:2
**eight** [2] - 13:1, 16:4
**either** [2] - 14:3, 20:10
**element** [1] - 5:9
**Eleventh** [3] - 3:11, 3:21, 4:10
**eliminated** [1] - 17:13
**eloping** [1] - 5:23
**encounter** [1] - 8:13
**engage** [1] - 5:14
**engaged** [2] - 3:7, 6:3
**engaging** [2] - 4:4, 9:1
**entered** [4] - 7:13, 10:4, 10:5, 10:6
**entering** [3] - 3:1, 3:6, 7:1
**entitled** [1] - 23:14
**escalated** [2] - 6:12,

9:23
**escalating** [5] - 4:19, 7:8, 7:12, 8:1, 9:21
**escalation** [3] - 12:20, 12:23, 20:24
**escape** [1] - 6:2
**essentially** [2] - 5:13, 21:4
**establish** [6] - 5:8, 5:9, 6:19, 7:3, 11:9, 21:12
**estopped** [2] - 3:12, 3:15
**event** [3] - 8:7, 9:19, 14:1
**eventually** [1] - 10:4
**evict** [1] - 20:20
**eviction** [3] - 14:2, 14:22, 20:25
**evidence** [12] - 4:14, 5:12, 5:17, 5:21, 6:14, 6:19, 6:20, 8:6, 11:9, 20:3, 20:4, 21:4
**examine** [1] - 21:24
**example** [3] - 8:21, 21:8
**expected** [2] - 5:24, 6:16
**expert** [1] - 15:14
**experts** [2] - 6:21, 21:2
**exposing** [2] - 7:19, 10:17
**extent** [3] - 14:11, 14:17, 22:3

**F**

**F.3d** [1] - 3:21
**fact** [12] - 5:15, 6:14, 8:14, 8:25, 9:1, 9:13, 10:21, 13:11, 17:10, 17:19, 21:14, 21:22
**fact-intensive** [1] - 17:19
**facts** [3] - 14:7, 14:12, 18:12
**factual** [2] - 18:6, 21:19
**factually** [1] - 8:13
**family** [1] - 12:1
**far** [1] - 6:11
**father** [5] - 3:23, 7:16, 12:5, 12:9, 12:14
**fax** [1] - 16:18
**faxed** [1] - 16:4
**FCRR** [1] - 23:17
**felony** [4] - 10:12,

10:16, 10:19, 10:25
**final** [1] - 14:20
**finally** [1] - 16:14
**fine** [1] - 22:13
**finish** [1] - 8:3
**first** [1] - 8:12
**five** [1] - 19:14
**Floor** [1] - 23:19
**Florida** [1] - 23:19
**follow** [1] - 16:15
**foregoing** [1] - 23:12
**four** [2] - 19:8, 19:12
**FPR** [1] - 23:17
**front** [1] - 14:17
**future** [9] - 5:20, 6:19, 9:5, 9:16, 11:15, 13:21, 16:25, 17:3, 20:7

**G**

**general** [1] - 13:14
**genitals** [1] - 7:19
**genuine** [1] - 17:9
**given** [3] - 5:14, 9:7, 14:23
**grandmother** [1] - 12:2
**grant** [2] - 18:10, 18:17
**granted** [1] - 10:7
**group** [3] - 5:24, 6:2, 21:11
**guards** [1] - 15:4
**guess** [1] - 8:12

**H**

**halls** [3] - 3:5, 11:24, 13:17
**hallways** [2] - 6:25, 7:11
**handle** [1] - 8:17
**harm** [1] - 17:22
**harm's** [2] - 7:20, 7:21
**harmed** [1] - 14:5
**health** [4] - 4:22, 7:22, 17:13, 20:19
**hear** [2] - 12:15, 17:6
**hereby** [1] - 23:12
**highly** [1] - 9:5
**himself** [4] - 3:6, 4:23, 7:20, 14:4
**Hinkle** [1] - 22:14
**holding** [1] - 9:15
**home** [4] - 3:6, 5:24, 6:2, 21:11

**homes** [1] - 3:1
**Honor** [11] - 3:19, 8:16, 11:8, 11:18, 12:7, 16:15, 17:5, 19:22, 21:19, 23:6, 23:7
**hope** [1] - 9:15
**hours** [3] - 5:25, 8:11
**housing** [4] - 21:21, 22:2, 22:6
**Hunt** [1] - 16:13

**I**

**identified** [3] - 13:19, 13:24, 21:2
**ignored** [1] - 15:21
**imagine** [2] - 14:3, 22:23
**immediately** [2] - 12:24, 16:9
**impeach** [2] - 11:10, 21:6
**implement** [1] - 17:11
**important** [1] - 13:9
**improper** [1] - 15:19
**incident** [31] - 4:16, 6:25, 7:3, 7:4, 7:6, 7:18, 7:19, 8:8, 8:10, 8:15, 10:10, 12:5, 12:11, 12:14, 12:20, 13:1, 13:3, 13:4, 13:6, 13:25, 14:6, 15:17, 15:21, 16:9, 17:23, 18:4, 18:6, 18:12
**incidents** [22] - 3:22, 4:18, 4:21, 5:20, 7:2, 7:5, 7:24, 11:5, 11:7, 11:14, 11:16, 11:25, 12:3, 12:20, 12:23, 16:19, 16:25, 18:1, 18:14, 18:16, 20:8
**includes** [1] - 22:24
**including** [2] - 6:10, 17:23
**inconspicuous** [1] - 9:13
**incorrect** [1] - 14:18
**indicate** [1] - 17:12
**individual** [5] - 4:12, 8:5, 15:10, 15:23, 17:17
**individualized** [3] - 5:5, 17:18, 20:2
**innocuous** [1] - 3:8
**instruct** [1] - 15:18
**intensive** [1] - 17:19
**intent** [2] - 22:1, 22:6

**interaction** [1] - 13:8
**intruder** [1] - 14:5
**involved** [1] - 22:3
**involving** [1] - 13:3
**irrelevant** [1] - 18:16
**issue** [12] - 4:1, 12:17, 13:14, 14:19, 14:20, 15:5, 15:18, 18:11, 20:10, 20:17, 21:17, 22:8
**issued** [4] - 14:8, 14:9, 14:15, 19:15
**issues** [3] - 6:9, 7:11, 17:10
**itself** [2] - 8:18, 10:22

**J**

**joined** [1] - 21:11
**Judge** [1] - 22:14
**judgment** [8] - 4:8, 4:11, 5:18, 6:8, 15:2, 17:9, 17:19, 18:9
**jury** [4] - 4:7, 14:19, 17:20, 18:7
**justify** [1] - 9:19

**K**

**kick** [1] - 11:3
**kind** [1] - 16:1
**knocking** [1] - 7:11
**known** [3] - 14:9, 18:13, 18:15

**L**

**language** [1] - 3:14
**lascivious** [1] - 10:16
**last** [1] - 12:20
**lasted** [1] - 8:19
**laundry** [24] - 4:17, 6:25, 7:2, 7:4, 7:6, 7:18, 8:8, 8:10, 8:22, 9:3, 10:9, 10:10, 12:11, 12:19, 13:3, 13:6, 13:12, 13:21, 13:22, 13:25, 14:21, 17:23, 18:4
**law** [5] - 3:3, 3:10, 10:20, 11:2, 22:3
**learned** [2] - 11:16, 16:19
**lease** [1] - 14:22
**least** [2] - 5:18, 18:19
**leave** [2] - 14:23,

16:10
**left** [3] - 7:14, 17:20, 18:7
**legally** [1] - 9:18
**lewd** [1] - 10:16
**life** [1] - 4:2
**likely** [1] - 19:12
**limine** [3] - 18:10, 19:23, 22:5
**limit** [1] - 22:4
**limited** [1] - 7:22
**list** [1] - 3:2
**listed** [1] - 15:2
**litany** [1] - 6:9
**living** [1] - 3:23
**load** [1] - 14:17
**lock** [1] - 8:17
**look** [2] - 12:16, 22:7
**looking** [4] - 9:21, 12:18, 19:1, 19:15
**looks** [1] - 13:16
**loss** [2] - 21:21
**lynchpin** [1] - 6:10

**M**

**machine** [1] - 6:4
**machines** [1] - 5:23
**maladaptive** [2] - 6:3, 9:2
**man** [1] - 13:11
**manager** [2] - 13:17, 16:11
**manner** [2] - 8:15, 18:5
**March** [5] - 18:19, 18:22, 18:25, 19:2, 23:17
**masturbated** [1] - 13:21
**masturbates** [1] - 13:20
**masturbating** [4] - 4:16, 7:19, 9:24, 13:12
**masturbation** [1] - 14:21
**material** [1] - 17:10
**matter** [1] - 23:14
**maximum** [1] - 19:8
**mean** [9] - 7:22, 9:6, 14:2, 14:22, 16:3, 20:10, 20:11, 20:13, 21:8
**meaning** [1] - 17:21
**means** [2] - 10:22, 17:12
**medical** [1] - 6:23
**meeting** [1] - 16:20

**mental** [1] - 20:19
**mere** [1] - 17:22
**MERWIN** [24] - 3:19, 4:10, 4:25, 5:4, 5:8, 7:5, 8:4, 8:16, 10:3, 10:14, 11:8, 11:18, 11:20, 12:7, 12:9, 16:15, 18:25, 19:12, 19:20, 19:25, 20:18, 22:22, 23:2, 23:7
**Merwin** [5] - 12:24, 16:14, 19:11, 19:15, 21:20
**Miami** [2] - 23:19, 23:19
**middle** [5] - 8:23, 8:24, 9:2, 9:16, 9:17
**might** [1] - 20:14
**minutes** [2] - 7:19, 8:20
**modification** [1] - 17:14
**moment** [1] - 16:22
**months** [5] - 12:11, 13:1, 13:4, 13:5, 13:6
**morning** [6] - 7:13, 8:11, 8:19, 9:4, 9:12, 9:14
**most** [6] - 4:1, 4:15, 7:7, 8:7, 16:16, 19:12
**mostly** [1] - 20:3
**mother** [3] - 4:4, 12:1, 13:2
**motion** [8] - 16:3, 17:8, 18:8, 18:10, 18:17, 19:18, 19:23, 22:4
**motivation** [1] - 5:22
**move** [3] - 6:12, 6:15, 22:10
**moved** [1] - 11:7
**moving** [3] - 11:6, 12:6, 18:14
**MR** [12] - 12:22, 14:7, 15:9, 16:2, 16:8, 17:5, 19:7, 19:10, 21:18, 22:13, 22:18, 23:6
**MS** [24] - 3:19, 4:10, 4:25, 5:4, 5:8, 7:5, 8:4, 8:16, 10:3, 10:14, 11:8, 11:18, 11:20, 12:7, 12:9, 16:15, 18:25, 19:12, 19:20, 19:25, 20:18, 22:22, 23:2, 23:7

**N**

**nature** [3] - 7:1,

10:17, 21:15
**necessarily** [2] - 20:15, 21:13
**need** [1] - 17:6
**never** [2] - 15:5, 17:2
**next** [2] - 18:22, 19:4
**night** [7] - 3:5, 7:11, 8:23, 8:24, 9:16, 9:18, 11:24
**nights** [1] - 8:21
**normal** [1] - 15:16
**norms** [1] - 9:10
**North** [1] - 23:19
**Northern** [1] - 22:15
**notes** [1] - 17:16
**nothing** [4] - 9:11, 14:16, 15:4, 22:5
**notice** [3] - 9:20, 14:16, 19:15
**nuisance** [1] - 17:22
**number** [2] - 14:3, 16:5

**O**

**objective** [7] - 4:12, 4:21, 5:4, 8:6, 11:10, 12:19, 20:2
**objectively** [1] - 14:6
**obviously** [7] - 4:23, 7:6, 8:8, 10:7, 16:23, 18:4, 19:25
**occupied** [1] - 17:24
**occur** [1] - 8:19
**occurrence** [1] - 14:11
**offer** [1] - 21:5
**offered** [1] - 21:8
**offering** [1] - 11:8
**Official** [1] - 23:18
**once** [2] - 4:13, 5:8
**one** [15] - 3:25, 5:10, 7:24, 8:9, 8:12, 8:13, 9:13, 9:25, 10:11, 10:24, 14:2, 14:10, 16:18, 17:25, 18:19
**one-time** [1] - 10:24
**ongoing** [2] - 3:25, 11:12
**open** [2] - 8:23, 13:7
**opinion** [2] - 6:23, 21:11
**opinions** [1] - 21:7
**opportunity** [1] - 5:14
**oranges** [1] - 21:18
**organs** [1] - 10:17
**otherwise** [3] - 4:3, 6:12, 18:18

**own** [3] - 4:5, 21:7, 21:13

**P**

**page** [1] - 16:4
**paid** [1] - 13:2
**part** [2] - 16:1, 16:8
**parties** [1] - 18:23
**patient** [1] - 3:14
**PATRICIA** [1] - 23:17
**pattern** [1] - 7:8
**pending** [1] - 22:9
**people** [1] - 7:21
**people's** [2] - 3:1, 3:6
**perceived** [2] - 14:4, 14:14
**perfect** [1] - 23:2
**period** [4] - 9:5, 13:1, 22:18, 22:24
**permission** [1] - 10:8
**person** [4] - 10:1, 13:15, 14:9, 14:18
**perspective** [1] - 9:22
**physical** [2] - 12:1, 15:13
**physician** [1] - 20:21
**physicians** [2] - 6:22, 9:8
**pick** [2] - 6:20, 21:5
**place** [4] - 8:15, 8:18, 16:22, 21:15
**placed** [1] - 22:4
**plaintiff** [7] - 5:9, 8:9, 12:17, 20:19, 21:1, 21:4, 21:12
**plaintiff's** [4] - 6:10, 11:13, 20:5, 20:18
**plaintiffs** [3] - 6:18, 11:5, 21:2
**plan** [4] - 6:18, 16:22, 21:14, 22:25
**pleadings** [2] - 19:16, 22:7
**point** [2] - 10:19, 20:12
**points** [1] - 8:10
**police** [2] - 13:8, 14:9
**policies** [1] - 17:14
**policy** [1] - 11:2
**pose** [2] - 18:1, 18:2
**posed** [4] - 8:4, 12:17, 15:3, 17:11
**poses** [3] - 9:3, 17:17, 18:11
**position** [1] - 3:12

**posture** [1] - 20:12
**practices** [2] - 17:14, 19:16
**premises** [1] - 15:4
**president** [1] - 10:15
**pretty** [2] - 14:1, 22:16
**prevent** [1] - 16:25
**prevented** [7] - 4:4, 5:20, 6:6, 11:14, 16:21, 20:7
**previous** [2] - 12:6, 18:14
**procedures** [1] - 17:14
**Proceedings** [1] - 23:8
**proceedings** [1] - 23:13
**process** [1] - 15:25
**progression** [1] - 20:25
**prompt** [1] - 22:16
**proper** [1] - 15:19
**properly** [1] - 21:6
**property** [7] - 3:1, 7:10, 7:17, 7:21, 7:23, 13:17, 16:10
**provide** [1] - 15:8
**provider** [1] - 22:6
**provision** [1] - 17:15
**psychiatrist** [1] - 6:16
**public** [3] - 6:1, 9:2, 9:3
**publicly** [2] - 9:23, 10:18
**punched** [1] - 7:16
**purported** [1] - 6:10
**purposes** [3] - 5:18, 6:8, 10:20
**put** [2] - 3:3, 3:13
**putting** [2] - 7:20

**Q**

**quote** [1] - 16:8

**R**

**ran** [2] - 10:4, 14:10
**read** [1] - 19:18
**really** [6] - 8:12, 9:14, 13:18, 13:22, 18:1, 18:2
**reason** [2] - 14:21, 14:23
**reasonable** [16] -

4:2, 4:8, 5:11, 5:19, 6:5, 11:14, 12:18, 12:21, 15:8, 15:9, 15:23, 17:19, 20:6, 20:10, 20:14, 20:25
**reasonably** [1] - 18:23
**reasons** [1] - 12:22
**receiving** [3] - 5:16, 16:23, 17:1
**recent** [2] - 4:15, 16:16
**reconsider** [1] - 17:2
**records** [1] - 6:23
**refer** [1] - 10:9
**reference** [1] - 11:25
**referred** [2] - 10:11, 10:12
**referring** [1] - 11:21
**regard** [1] - 21:7
**regarding** [3] - 12:18, 18:3, 19:23
**regardless** [2] - 5:15, 8:25
**regards** [1] - 14:20
**regulations** [1] - 17:11
**related** [1] - 11:4
**relates** [2] - 6:9, 11:23
**relevance** [1] - 6:8
**relevant** [7] - 3:25, 5:7, 20:1, 20:5, 20:9, 20:17, 21:23
**relied** [1] - 10:24
**relies** [1] - 21:13
**rely** [2] - 6:21, 6:23
**relying** [1] - 7:2
**remove** [2] - 17:25, 18:3
**removing** [1] - 21:3
**render** [1] - 22:8
**repercussions** [1] - 9:10
**reply** [1] - 16:17
**report** [1] - 14:9
**reported** [1] - 10:6
**Reporter** [1] - 23:18
**reporter** [1] - 3:18
**representative** [1] - 4:15
**request** [2] - 16:3, 19:22
**requested** [5] - 5:13, 15:20, 16:5, 16:12
**requesting** [1] - 10:21
**requirement** [1] - 14:23
**reside** [1] - 8:2

**residence** [2] - 6:3, 15:4
**resident** [3] - 10:3, 10:24, 14:4
**resident's** [4] - 4:21, 7:1, 7:13, 9:21
**residents** [3] - 7:23, 8:23, 9:19
**residing** [1] - 3:23
**respectfully** [1] - 18:8
**response** [5] - 8:10, 15:1, 16:3, 16:4, 16:18
**review** [1] - 5:2
**rise** [1] - 19:3
**risk** [4] - 9:3, 9:15, 17:12, 17:22
**risks** [1] - 15:3
Rodriguez [2] - 16:5, 16:16
**room** [22] - 4:17, 6:25, 7:3, 7:4, 7:6, 7:18, 8:8, 8:10, 8:22, 9:3, 10:9, 12:11, 12:20, 13:3, 13:6, 13:12, 13:21, 13:22, 13:25, 14:21, 18:4
**RPR** [1] - 23:17
**ruling** [2] - 20:1, 22:8

**S**

**safely** [1] - 8:1
**safety** [6] - 4:5, 4:6, 4:23, 7:23, 17:13, 21:14
**saw** [1] - 10:5
**scheduled** [2] - 18:18, 22:22
**schizophrenia** [2] - 6:15, 20:22
**School** [2] - 3:11, 3:20
**screamed** [1] - 10:4
**second** [3] - 5:13, 10:20, 22:25
**second-chance** [1] - 10:20
**security** [3] - 3:4, 11:21, 11:22
**Security** [1] - 3:13
**see** [1] - 19:3
**seek** [2] - 14:2, 18:3
**sense** [1] - 14:19
**separate** [1] - 12:23
**services** [1] - 17:15
**set** [2] - 18:20, 19:14
**setting** [1] - 9:2

**seven** [1] - 14:16
**seven-day** [1] - 14:16
**several** [1] - 12:22
**severe** [1] - 7:7
**sexual** [2] - 6:3, 9:1, 10:17
**shameless** [1] - 13:18
**shifts** [1] - 5:9
**shortly** [4] - 7:15, 7:17, 12:24, 12:25
**show** [3] - 4:11, 5:19, 11:13
**showing** [1] - 4:13
**shows** [3] - 5:21, 6:5, 6:14
**shut** [1] - 8:17
**significance** [1] - 8:14
**significant** [3] - 14:1, 17:12, 17:22
**similar** [1] - 16:12
**situation** [2] - 8:13, 9:6
**situations** [1] - 15:2
**slight** [1] - 19:22
**slow** [1] - 3:17
**small** [4] - 3:4, 9:10, 11:21, 11:22
**social** [4] - 3:4, 9:10, 11:21, 11:22
**Social** [1] - 3:13
**someone** [1] - 9:25
**sorry** [8] - 5:25, 6:11, 8:4, 11:22, 12:13, 18:21, 18:25
**spaced** [1] - 19:17
**Spanish** [1] - 13:18
**specific** [1] - 3:14
**specifically** [4] - 3:10, 10:12, 11:23, 15:20
**stage** [1] - 4:11
**standpoint** [1] - 12:19
**starting** [1] - 19:5
**starts** [1] - 22:15
**statement** [1] - 8:5
**statements** [1] - 3:15
**States** [1] - 23:18
**statute** [1] - 17:12
**stop** [1] - 17:3
**straw** [1] - 14:20
**subsequent** [4] - 5:6, 5:12, 9:17, 18:16
**subsequently** [2] - 20:4, 20:16
**substantial** [1] - 15:3
**sufficient** [1] - 11:3

**suggest** [3] - 8:12, 9:4, 9:11
**suggestion** [1] - 16:24
**Sujay** [2] - 16:5, 16:16
**summary** [6] - 4:11, 5:18, 6:8, 15:1, 17:8, 18:9
**supervised** [1] - 5:25
**supervision** [1] - 6:1
**support** [2] - 15:20, 16:6

## T

**Talavera** [2] - 3:11, 3:20
**telephone** [1] - 12:10
**ten** [1] - 13:6
**tenancy** [2] - 5:16, 7:10
**tenant** [1] - 11:3
**tenants** [1] - 15:3
**testified** [5] - 6:16, 7:25, 16:17, 16:22, 20:21
**testify** [2] - 21:2, 21:9
**testimony** [3] - 4:14, 10:14, 21:5
**THE** [34] - 3:17, 4:7, 4:24, 5:1, 5:6, 6:24, 8:3, 8:9, 9:25, 10:9, 11:5, 11:16, 11:19, 12:5, 12:8, 12:13, 13:25, 15:7, 15:22, 16:7, 16:14, 17:6, 19:3, 19:9, 19:11, 19:14, 19:24, 20:9, 21:16, 22:7, 22:17, 22:20, 22:24, 23:3
**therapist** [1] - 15:10
**therapy** [10] - 5:15, 5:16, 15:13, 15:15, 15:16, 15:24, 16:21, 16:23, 17:1
**thereafter** [3] - 12:24, 12:25
**threat** [33] - 3:3, 3:6, 3:9, 4:5, 4:22, 5:10, 7:3, 8:4, 12:17, 13:10, 13:13, 13:18, 13:19, 13:23, 13:24, 14:4, 14:6, 14:15, 14:18, 15:3, 15:15, 17:11, 17:12, 17:17, 17:21, 18:2, 18:12, 21:7, 21:9, 21:12, 21:14

**three** [3] - 15:2, 19:7, 21:2
**threshold** [1] - 5:8
**throughout** [2] - 5:16, 7:9
**together** [1] - 7:5
**tolerance** [1] - 11:2
**took** [5] - 4:17, 8:15, 8:18, 11:9, 17:24
**total** [2] - 19:9, 19:10
**trafficked** [1] - 9:5
**transcription** [1] - 23:13
**treat** [1] - 21:10
**treated** [1] - 21:10
**treating** [2] - 6:22, 9:8
**treatment** [9] - 4:1, 5:17, 5:21, 6:14, 6:18, 6:20, 11:11, 20:4, 21:3
**trial** [6] - 6:9, 18:18, 18:24, 22:11, 22:14, 22:16
**triggering** [1] - 8:7
**truth** [1] - 3:15
**try** [1] - 19:6
**trying** [4] - 9:12, 14:17, 21:12, 22:25
**two** [7] - 5:10, 8:14, 13:3, 13:5, 13:22, 22:18, 22:24
**two-week** [2] - 22:18, 22:24
**type** [4] - 8:20, 16:11, 16:12, 19:17

## U

**ultimately** [2] - 6:21, 20:13
**under** [3] - 11:3, 11:10, 18:4
**undisputed** [1] - 4:15
**unfortunately** [1] - 9:7
**unit** [7] - 4:20, 4:21, 7:13, 9:22, 10:5, 10:7, 10:8
**United** [1] - 23:18
**unless** [1] - 18:13
**unlike** [1] - 15:13
**unlocked** [1] - 10:7
**up** [1] - 16:16

## V

**Velez** [9] - 7:9, 8:13, 8:21, 11:10, 13:14, 14:3, 16:10, 18:3, 21:22
**Velez's** [1] - 16:5
**versus** [2] - 16:13, 17:22
**view** [2] - 14:7, 14:11
**viewed** [1] - 14:6
**violation** [3] - 13:8, 14:8, 14:14

## W

**waiver** [2] - 11:22, 16:6
**walk** [2] - 8:25, 9:16
**walked** [2] - 10:7, 17:23
**walking** [1] - 13:17
**wandering** [4] - 3:5, 6:25, 7:11, 11:24
**washing** [2] - 5:23, 6:4
**ways** [1] - 14:3
**wee** [1] - 8:11
**week** [4] - 18:22, 22:18, 22:24, 23:1
**weird** [1] - 13:16
**whatsoever** [2] - 22:1, 22:5
**whole** [1] - 20:18
**wholly** [1] - 4:15
**window** [7] - 7:15, 7:16, 7:17, 9:23, 13:1, 13:2, 13:5
**words** [2] - 9:11, 20:24
**works** [1] - 8:21
**worthwhile** [1] - 14:13

## Y

**years** [1] - 13:22
**young** [1] - 13:11

## Z

**zero** [1] - 11:2